JOHN A. DOYLE, Plaintiff-Appellee, v. WHITE METAL ROLLING AND STAMPING CORPORATION *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—91—2960

Opinion filed June 29, 1993.

French, Kezelis & Kominiarek, P.C., of Chicago (Algimantas Kezelis, Russell P. Veldenz, and Robert A. Kezelis, of counsel), for appellants.

Terrence K. Hegarty & Associates, Ltd., of Chicago (Terrence K. Hegarty and James S. Smith, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff John Doyle was injured on November 13, 1982, after falling off of a stepladder manufactured by codefendant White Metal Rolling and Stamping Corporation (White Metal) and sold by codefendant Sears, Roebuck & Company (Sears) to plaintiff's employer, the Joliet Correctional Center (JCC).

Plaintiff filed a products liability action against defendants on February 13, 1985, count I of which alleged that the ladder "was unreasonably dangerous for users because [it] failed to perform in a manner reasonably expected since it was incapable of sustaining human weight when used in a foreseeable manner without collapsing." The second count charged that the ladder was unreasonably dangerous for users because the rear rails were too weak and the steps were too narrow.[1] After defendants' motions to dismiss for failure to state a cause of action were denied, the cause was tried to a jury wherein the following pertinent facts were adduced.

### THE INJURY

Plaintiff testified that on November 13, 1982, he was working his usual day shift as a stationary engineer at the JCC. At about 8:15, he went into the powerhouse in order to obtain a nipple or a pet cock,

---

[1]Plaintiff eventually abandoned his claim that the rear rails were too weak, and the jury was instructed that plaintiff's only claim of defect on count II concerned the steps.

both of which were contained in a milk crate atop a cabinet along the north wall of the powerhouse. The cabinet was six feet tall, and there was an aisle of approximately 54 inches between it and a water tank to the south.

Plaintiff, who at the time of the incident was 5 feet 7 inches tall, and weighed 162 pounds, removed from the storage area a five-foot aluminum ladder which had just arrived the previous day. He placed it on the floor with all four of its legs on the ground facing east, two inches in front of the cabinet (on his left) directly under the milk crate. After extending its spreader arms and bucket tray, he climbed onto the second step and reached into the crate with his right hand while holding on to the top step of the ladder with his left hand. Approximately three minutes later, he sensed that the ladder was beginning to collapse; consequently, he grabbed the top of the ladder with both hands in order to steady it, but the ladder went forward and plaintiff's right leg slid between the second and third steps and struck the ground. Plaintiff eventually ended up on the ground atop the ladder with his right leg still wedged between the second and third steps. He also noticed while he was lying on the ground that the right spreader arm had buckled and was twisted out to the right and that the right rear leg of the ladder was also buckled.

As soon as plaintiff fell to the ground, he screamed for help because he could not remove his leg, which had bones protruding through his skin, from the ladder. As he writhed in pain, he crawled to the north wall and extracted his leg from the aluminum ladder. Plaintiff then tried unsuccessfully to hop on his left leg to a phone on the wall. Ultimately, he crawled to the phone, called for help, and then scrambled to the powerhouse door in order to allow entrance into the facility.

Gaylon Yates, the shift commander on duty at the time of the accident, testified that he responded to a call to help plaintiff. He arrived about 5 or 10 minutes after the incident and immediately saw that plaintiff's leg was badly damaged and that he was in severe pain. In response to Yates' question as to what had happened, plaintiff stated that "the ladder buckled out under [me] causing [me] to fall off of it." After having his leg stabilized with an air splint, plaintiff was transported by ambulance to the Silver Cross Hospital.

Plaintiff's treating physician, Michael Greenwald, M.D., testified that plaintiff suffered a compound comminuted fracture of his tibia and fibula, which had protruded through his skin. Dr. Greenwald also related that the talus bone of plaintiff's ankle had been driven into his tibia. Consequently, he was forced to perform two separate operations

to fuse the ankle and leg bones. The injury did not heal sufficiently to allow plaintiff to walk until August 1985. Dr. Greenwald opined that the injury which plaintiff suffered could have occurred only if he fell on a rigid or absolutely stiff leg, and he also stated that such rigidity could occur when one's leg slips off a ladder and then becomes wedged between its second and third step.

## THE LADDER

The parties stipulated that White Metal designed and manufactured the aluminum step ladder involved in the incident. The evidence established that the ladder was manufactured in April 1982 and was sold by Sears to the JCC on October 28, 1982. The aluminum ladder was five feet tall, weighed about eight pounds, had steps which were 2½ inches wide, and had two cross braces on its back side.

The parties agree that at the time of its manufacture, the ladder in question complied with the applicable 1972 manufacturing standards of Underwriters Laboratories (UL) and the American National Standards Institute (ANSI). In 1980, however, UL and ANSI began amending their manufacturing standards by requiring all ladders to pass a new "torsion spreader arm test." On January 23, 1981, White Metal submitted two prototype ladders similar to the one involved in the accident to UL for testing, both of which failed initially. However, White Metal tendered a revised model which did pass the test. A similar process occurred with respect to tests conducted by ANSI, i.e., an initial sample aluminum ladder, submitted by Sears, failed the safety test, but a revised and more sturdy model passed. It is clear from the record, however, that compliance with these more stringent standards was not mandated until June (UL standard) and October (ANSI standard) of 1982.

## THE SIMILAR OCCURRENCE

Charles Wysocki testified for the plaintiff through an evidence deposition that in the fall of 1982, he purchased a five-foot aluminum step ladder from Sears in Tuscon, Arizona. The first time Wysocki used it in order to clean out a friend's rain gutter, he placed the ladder on solid ground and carefully opened the spreader arms. He then climbed to the third step, and after he was on the ladder for about a minute, it began to twist under him. Wysocki kicked the ladder out from under him so that he would not fall on top of it, and he tumbled to the ground. When he looked at the ladder after he had fallen, he noticed that the "rear part of the ladder was twisted out of shape."

EXPERT TESTIMONY

Ronald Lobodzinski, a machine design engineer called by plaintiff as his expert witness, testified that when a person twists on a ladder, he creates a torsion force on the rear legs of the ladder. He opined to a reasonable degree of scientific certainty that the buckling of the rear right leg of the ladder, which was the result of the torsion force exerted by plaintiff when he reached inside the milk crate, caused plaintiff to fall to the ground. Therefore, Lobodzinski concluded, in his opinion the ladder was unreasonably dangerous because it "was used in a normal expected manner and it failed in a dangerous manner unexpectedly." Lobodzinski also opined to a degree of scientific certainty that the 2½-inch-wide steps were a defect in the ladder because they allowed a portion of the foot to overhang and therefore cause a user to slip and fall.

Defendants responded by presenting the expert testimony of Richard Ver Halen. He stated that in his opinion, the torsion force created by plaintiff's reaching for the crate could not have caused the right hind leg to buckle. Instead, he felt that plaintiff simply lost his balance, which caused him and the ladder to fall simultaneously, and the damage to the ladder—*i.e.*, the buckled spreader arm and rear leg—was the result and not the cause of the fall. He offered two reasons for this conclusion. First, he opined that had plaintiff fallen in the manner in which he described, he would have left some marking on the boiler tank to his right. Second, he stated that even if the right hind leg had completely failed, the ladder could not have caused plaintiff's fall because the other three legs, especially the two front ones, would have borne the brunt of his weight and prohibited the ladder from collapsing.[2] He also opined that the fact that the steps were only 2½ inches wide had nothing whatsoever to do with plaintiff's fall. For these reasons, Ver Halen concluded that, in his opinion, the ladder did perform as was reasonably to be expected and thus was not unreasonably dangerous.

Ronald Stillman, an engineer who conducted performance tests on ladders for Sears, also testified as an expert witness through an evidence deposition. After studying photographs of the ladder in question, he opined to a degree of scientific certainty that the damage done to the rear right leg of the ladder could have been caused only if

---

[2]Ver Halen illustrated this by putting on a demonstration wherein he briefly stood on the second step of a ladder missing the right hind leg without falling.

an external force, such as a body, fell on top of it, and under no circumstances could such damage be inflicted by torsion forces resulting from someone twisting on the second step of the ladder.

The jury found for the plaintiff in the amount of $681,128.98, and after the trial court denied defendants' post-trial motions, it entered judgment in favor of the plaintiff for that amount. Defendants appeal from that judgment.

## I

It is beyond dispute that in order to establish a *prima facie* case of strict liability in tort, a plaintiff must plead and prove the following three elements: (1) that an injury resulted from a condition of the product; (2) the condition of the product was an unreasonably dangerous one; and (3) that the condition existed at the time the product left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623, 210 N.E.2d 182, 188, *overruled on other grounds, Dixon v. Chicago & North Western Transportation Co.* (1992), 151 Ill. 2d 108, 601 N.E.2d 704.) Defendants argue, however, that a plaintiff cannot establish that a product was unreasonably dangerous simply by pleading and proving that it did not perform as expected, since such a minimal burden would render manufacturers insurers of their products. Instead, they assert, the jury must be instructed that plaintiffs are required to point to a specific defect in the product, or at least illustrate an absence of other possible causes of injury, before they can recover under strict liability. Plaintiff counters by asserting that pursuant to *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449, he is entitled to establish that a product was defective by showing only that it failed to perform in a manner reasonably to be expected.

In *Tweedy*, the plaintiff brought a strict liability action against the defendant for brakes which malfunctioned, causing her to collide with a tree. The plaintiff offered no expert testimony concerning a specific defect in the automobile's braking system. (*Tweedy*, 64 Ill. 2d at 572, 357 N.E.2d at 451.) Accordingly, the defendant contended that the plaintiff failed to prove that the brakes were defective, arguing that the verdict rendered in her favor was predicated on "mere conjecture and surmise." (*Tweedy*, 64 Ill. 2d at 573, 357 N.E.2d at 451.) Our supreme court rejected defendant's contention, and relying on a theory first espoused by Justice Roger J. Traynor, held:

"A *prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reason-

able secondary causes the product failed 'to perform in the manner reasonably to be expected in light of [its] nature and intended function.' [Citations.]" (*Tweedy*, 64 Ill. 2d at 574, 357 N.E.2d at 452.) The court went on to hold that because there was no reasonable secondary cause for the failure of the brakes, the plaintiff had established a *prima facie* case of products liability. *Tweedy*, 64 Ill. 2d at 574-75, 357 N.E.2d at 452.

■ After *Tweedy*, courts in this State have generally held that a plaintiff need not pinpoint the specific defect in a product in order to recover under strict liability. (*Bejda v. S G L Industries, Inc.* (1980), 82 Ill. 2d 322, 330-31, 412 N.E.2d 464, 467; *Abel v. General Motors Corp.* (1987), 155 Ill. App. 3d 208, 214-15, 507 N.E.2d 1369, 1374, *appeal denied* (1987), 116 Ill. 2d 547, 515 N.E.2d 100; *Johnson v. Amerco, Inc.* (1980), 87 Ill. App. 3d 827, 830, 409 N.E.2d 299, 303; *Erzrumly v. Dominick's Finer Foods, Inc.* (1977), 50 Ill. App. 3d 359, 363, 365 N.E.2d 684, 687; see *Neighbors ex rel. American States Insurance Co. v. City of Sullivan* (1975), 31 Ill. App. 3d 657, 659, 334 N.E.2d 409, 411; *Belleville National Savings Bank v. General Motors Corp.* (1974), 20 Ill. App. 3d 707, 709, 313 N.E.2d 631, 633.) Instead, a plaintiff may create an inference that a product was defective by direct or circumstantial evidence that: (1) there was no abnormal use of the product; (2) there was no reasonable secondary cause of the injury; and (3) the product failed to perform in the manner reasonably to be expected in light of its nature and intended function. *Bejda*, 82 Ill. 2d at 330-31, 412 N.E.2d at 467-68; *American Family Insurance Co. v. Village Pontiac-G M C, Inc.* (1992), 223 Ill. App. 3d 624, 629, 585 N.E.2d 1115, 1119; *Ralston v. Casanova* (1984), 129 Ill. App. 3d 1050, 1057, 473 N.E.2d 444, 449; *Millette v. Radosta* (1980), 84 Ill. App. 3d 5, 21, 404 N.E.2d 823, 836; *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 177, 298 N.E.2d 289, 297; *Bollmeier v. Ford Motor Co.* (1970), 130 Ill. App. 2d 844, 849-50, 265 N.E.2d 212, 216-17.[3]

Having defined the elements of a *"Tweedy"* count sounding in products liability, we must next determine whether the jury was properly instructed. Generally, the test for determining whether the trial court abused its discretion when instructing the jury is whether, when considered as a whole, the instructions were suffi-

---

[3]One court has compared this approach to the doctrine of *res ipsa loquitur* in the area of negligence. *St. Paul Fire & Marine Insurance Co.*, 12 Ill. App. 3d at 177, 298 N.E.2d at 297-98.

ciently clear so as not to mislead the jury, and whether they fairly and correctly stated the principles of law pertaining to the case. (*Saunders v. Schultz* (1960), 20 Ill. 2d 301, 314, 170 N.E.2d 163, 170; *Dabros v. Wang* (1993), 243 Ill. App. 3d 259, 267; *Wille v. Navistar International Transportation Corp.* (1991), 222 Ill. App. 3d 833, 839, 584 N.E.2d 425, 429, *appeal denied* (1992), 144 Ill. 2d 644, 591 N.E.2d 32.) Moreover, where the Illinois Pattern Jury Instructions provide an instruction on an issue, that instruction should be given to the jury by the trial court unless it finds that the pattern instruction does not accurately state the law. (134 Ill. 2d R. 239(a); *Colls v. City of Chicago* (1991), 212 Ill. App. 3d 904, 571 N.E.2d 951, *appeal denied* (1991), 141 Ill. 2d 537, 580 N.E.2d 110.) However, where no Illinois pattern instruction is available on a particular issue, the court should submit an instruction which accurately states the law and is simple, brief, impartial and nonargumentative. 134 Ill. 2d R. 239(a); see *Daly v. Carmean* (1991), 210 Ill. App. 3d 19, 31-32, 568 N.E.2d 955, 963, *appeal denied* (1991), 141 Ill. 2d 538, 580 N.E.2d 110.

In the case at bar, the court gave the jury the following instruction:

"Under Count I of the complaint the issues are as follows, plaintiff claims he was injured as a result of the use of a step ladder and that there existed in the step ladder at the time it left the control of the defendants, White Metal and Sears, a condition which made the step ladder unreasonably dangerous in the following respect.

The step ladder failed to perform in the manner reasonably to be expected in light of its nature and intended function. The plaintiff further claimed that the condition of the step ladder was a proximate cause of the plaintiff's injury.

\* \* \*

\*\*\* [T]he plaintiff has the burden of proving each of the following propositions in Count I of his complaint as to each defendant. First, that the condition claimed by the plaintiff as stated to you in these instructions existed in the step ladder. Second, that the condition made the step ladder unreasonably dangerous. Third, that the condition existed at the time the step ladder left the control of White Metal and Sears. Fourth, that the plaintiff was injured. And fifth, that the condition of the step ladder was a proximate cause of plaintiff's injuries."

■ These instructions track those provided in the Illinois Pattern Jury Instructions for product liability actions in general. (See Illinois Pattern Jury Instructions, Civil, Nos. 400.02, 400.06 (3d ed. 1992).) However, under the facts of this case, those instructions misstated the law, for the reason that they allowed the jury to find that the ladder was unreasonably dangerous if it found only that the ladder failed to perform in the manner reasonably to be expected in light of its intended function. Yet, in order to establish that a product was unreasonably dangerous under his *"Tweedy* count," wherein no specific defect in the product was alleged, plaintiff was required to prove also that he did not use the product in an unreasonable manner and that no reasonable secondary causes of his injury existed. In fact, defendants' precise theory of the case was that there was another cause of the accident—plaintiff's loss of balance while on the ladder. Defendants correctly assert that when a jury is instructed as was done here, a manufacturer becomes an insurer of the product, a proposition directly contrary to the law of Illinois. (See, *e.g., Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368, 372.) Accordingly, we hold that the court erred in giving the jury the above-quoted pattern instructions because they incorrectly stated the law as set forth by our supreme court in *Tweedy.*

Having determined that the trial court improperly instructed the jury on count I of plaintiff's complaint, we must next decide whether that error requires a reversal in this case. A reviewing court ordinarily will not reverse the trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the complaining party. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1088, 560 N.E.2d 969, 973.) Moreover, our supreme court has held that "[w]hen there is a general verdict and more than one theory [of recovery] is presented [to the jury], the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, [who] failed to request special interrogatories, cannot complain." *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 329, 515 N.E.2d 68, 72.

In the case *sub judice,* although it is clear that the instruction with respect to count I of plaintiff's fourth amended complaint was faulty, defendants make no objection to the instruction concerning

count II of the complaint,[4] and plaintiff offered evidence supporting its theory of recovery under that count. In addition, defendants did not request that the jury be given special interrogatories, the answers to which would have made clear whether their verdict applied to the *"Tweedy* count" (count I) or to the "specific defect count" (count II); such a procedure would have been of particular value here since defendants disputed the validity of count I from the outset in this case.

Accordingly, we hold that defendants' failure to request special interrogatories, the answers to which would have clarified the jury's view of defendant's liability under the *"Tweedy* count" as opposed to the specific defect count, was fatal to their complaint that the jury was improperly instructed.

## II

Defendants next assert that the trial court erred in denying their motion for a judgment *non obstante verdicto* or, in the alternative, a motion for a new trial. It is well settled that a trial court should not enter a judgment *n.o.v.* unless all of the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict based on the evidence could ever stand (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14); and that standard also governs our consideration of a trial court's denial of such a judgment. *Knight v. Haydary* (1992), 223 Ill. App. 3d 564, 569, 585 N.E.2d 243, 247, *appeal denied* (1992), 145 Ill. 2d 635, 596 N.E.2d 629.

Moreover, a trial court should set aside a verdict and grant a new trial only if the verdict is contrary to the manifest weight of the evidence. (*Pedrick*, 37 Ill. 2d at 509, 229 N.E.2d at 513.) A verdict will be deemed to be against the manifest weight of the evidence only if it is palpably erroneous and wholly unwarranted, clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable and not based on the evidence. *Loitz v. Remington Arms Co.* (1988), 177 Ill.

---

[4]The court instructed the jury with regard to count II as follows:

"The issues to be decided by you under *** count [II] are as follows. The plaintiff claims he was injured as a result of the use of the step ladder, and that there existed in the step ladder at the time it left the control of the defendants, White Metal and Sears, a condition which made the step ladder unreasonably dangerous in the following respects.

The design of the ladder steps was too narrow. The plaintiff further claims that this condition of the narrow design the [*sic*] ladder steps was a proximate cause of his injuries."

App. 3d 1034, 1050, 532 N.E.2d 1091, 1101, *rev'd on other grounds* (1990), 138 Ill. 2d 404, 563 N.E.2d 397.

The instant case once again "presents a classic example of what has become by this time the ubiquitous 'battle of the experts.'" *(Carter v. Johnson* (1993) 247 Ill. App. 3d 291, 300, citing *Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 991, 479 N.E.2d 1000, 1006.) Plaintiff's expert, Richard Lobodzinski, testified that in his opinion, to a reasonable degree of scientific certainty, the ladder was defective because it was unreasonably dangerous. More specifically, with respect to the allegations of count I of plaintiff's complaint, Lobodzinski opined that the ladder failed to perform as was reasonably to be expected because its rear right leg buckled and its spreader arm moved upward when plaintiff exerted torsion forces by reaching into the milk crate. Furthermore, he stated that the deformation of the right rear leg of the ladder was not of the type that could have been caused by plaintiff simply by falling on top of it, especially since there was no room in the corridor for the plaintiff to fall in any direction but forward.

Regarding count II of plaintiff's complaint, Lobodzinski opined to a reasonable degree of scientific certainty that the fact that the steps were only 2½ inches wide made the ladder unreasonably dangerous because: (1) too much of the user's foot overlaps, thus putting too much pressure on the front of the step; and (2) if users should happen to slip while on the ladder, it is much easier for their feet to become lodged inside the narrower steps.

Defendants, of course, refuted these opinions with their own expert testimony. Both of their experts, Richard Ver Halen and Ronald Stillman, testified that in their opinion, to a degree of scientific certainty, the damage to the right rear leg of the ladder was caused by plaintiff's body falling on top of it, as the type of deformation found on the ladder could not have been caused by buckling from torsion forces. Moreover, Ver Halen opined that plaintiff could not have fallen forward as he had testified because no mark was found on the boiler tank, and Ver Halen theorized that the ladder would have left some sort of blemish thereupon had the incident occurred as plaintiff described. He also stated that even where a rear leg of the ladder completely fails, the other three legs continue to support most of the user's weight, thus making it impossible for the ladder to have collapsed as plaintiff's expert asserted. Finally, Ver Halen opined that the 2½-inch-wide steps on the ladder were not unreasonably dangerous and had absolutely nothing to do with plaintiff's injury. Accordingly, both defense experts believed that no defect existed in the ladder and that

the sole cause of plaintiff's injury was his loss of balance while standing on the ladder.

■ When confronted with a situation in which the fact finder was offered conflicting expert testimony, we have invariably stated that we will not reweigh the credibility of the witnesses or reweigh the evidence. (See, *e.g., Dabros*, 243 Ill. App. 3d at 264.) Although defendants vigorously urge that Lobodzinski's testimony is unbelievable, that was a matter for them to take up during cross-examination and closing argument. The sole question before us is whether his testimony was so preposterous that no jury could ever believe it; and, after reviewing the record, we find that such a conclusion is unwarranted. Accordingly, we reject defendants' argument that the trial court improperly denied its motion for a judgment *n.o.v.* and/or new trial.

### III

Defendants next assign as error the trial court's admission of evidence concerning post-manufacture industry requirements. Evidence of standards promulgated by an industry, trade group or regulatory agency may be relevant in a products liability action in order to determine whether a condition is unreasonably dangerous. (*Ruffiner v. Material Service Corp.* (1987), 116 Ill. 2d 53, 58, 506 N.E.2d 581, 584.) Moreover, evidence of standards may be relevant and admissible even though the standards have not been imposed by statute or promulgated by a regulatory body and therefore do not have the force of law. (*Ruffiner*, 116 Ill. 2d at 58, 506 N.E.2d at 584; *Merchants National Bank v. Elgin, Joliet & Eastern R.R. Co.* (1971), 49 Ill. 2d 118, 125, 273 N.E.2d 809, 813.) To be admissible, however, standards must be relevant "in terms of both time and conduct involved." *Murphy v. Messerschmidt* (1977), 68 Ill. 2d 79, 84, 368 N.E.2d 1299, 1302.

■ In the case at bar, the jury heard extensive evidence regarding the industry standards promulgated by ANSI and UL. Defendants complain that plaintiff was improperly allowed to introduce evidence that several prototype ladders similar to the one he used failed newly developed tests performed by UL and ANSI in 1981, even though passing those tests was not mandated until after the ladder was manufactured in April 1982. Defendants' argument, however, is baseless. This evidence was clearly relevant in terms of time because it established that defendants were aware that the ladder used by plaintiff was not meeting safety standards which were to take effect in the immediate future. Further, this evidence was relevant to the question of defendants' knowledge of safety hazards because the standards *were* in place when the ladder was sold to JCC, even though they were not

in effect at the time of manufacture. Consequently, we hold that the trial court did not abuse its discretion in admitting evidence of the ANSI and UL standards, despite the fact that they were not yet being imposed at the time the ladder was manufactured. See *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 392, 356 N.E.2d 93, 98-99 (post-manufacture standards which were "intended to eliminate existing hazards as well as to prevent the creation of future ones" properly admissible).

## IV

■ Defendants next assign as error the trial court's admission of the testimony of Charles Wysocki, who testified that he fell off a similar ladder, which he bought from Sears, the first time he used it. Defendants' argument is without warrant. A party may introduce evidence of prior accidents in order to establish the existence of a dangerous condition (*Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 114, 499 N.E.2d 1373, 1376; *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 441, 396 N.E.2d 534, 537-38; *Simmons v. Aldi-Brenner Co.* (1987), 162 Ill. App. 3d 238, 245, 515 N.E.2d 403, 408, *appeal denied* (1988), 119 Ill. 2d 575, 522 N.E.2d 1257); and the prior occurrences need not have occurred in an identical manner, but instead need only to have been substantially similar. (*Ballweg*, 114 Ill. 2d at 114, 499 N.E.2d at 1376; *Rucker*, 77 Ill. 2d at 441, 396 N.E.2d at 538; *Simmons*, 162 Ill. App. 3d at 245, 515 N.E.2d at 408.) In this case, the accidents incurred by plaintiff and Wysocki were substantially similar in that: (1) each ladder involved was a five-foot aluminum ladder purchased from Sears and manufactured by White Metal; (2) they were both using the ladder for the first time; (3) they both set up the ladder on solid ground; and (4) the back legs of both ladders collapsed after a short period of time while the user was reaching upward. Accordingly, we hold that the trial court did not abuse its discretion in allowing the testimony of Charles Wysocki.

## V

Defendants next complain that the trial court improperly allowed the hearsay testimony of Gaylon Yates under the spontaneous declaration exception to the rule against hearsay. We disagree. In order for a statement to qualify as a spontaneous declaration, the following three requirements must be met: (1) an occurrence sufficiently startling to produce a spontaneous, unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Zwart* (1992), 151 Ill. 2d 37, 46, 600 N.E.2d

1169, 1173; *People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804, 807; *Flath v. Madison Metal Services, Inc.* (1991), 212 Ill. App. 3d 367, 376-77, 570 N.E.2d 1218, 1225.) The party offering the statement must establish that it meets these requirements (*Flath*, 212 Ill. App. 3d at 377, 570 N.E.2d at 1225), and the determination of whether they are met, depending on the particular circumstances of each case, is within the sound discretion of the trial court. *Lewis v. Beckman* (1978), 57 Ill. App. 3d 482, 484, 373 N.E.2d 589, 591.

■ In this case, Yates testified that when he arrived at the site of the incident about 5 or 10 minutes after it occurred, plaintiff was sitting on the ground in excruciating pain and that his leg appeared to be broken. When Yates asked him what had happened, plaintiff responded that "[I] was up on the stepladder, and the ladder buckled out under [me] causing [me] to fall off of it."

There is no question but that the above statement qualified as a spontaneous declaration. First, plaintiff's falling off the ladder, thereby shattering his leg, was a sufficiently startling event such that it would produce an unreflecting outcry. Second, only a few minutes transpired between the event and the statement; thus, plaintiff certainly did not have substantial time within which to fabricate a story. Finally, plaintiff's statement unquestionably related to the startling event. Accordingly, we hold that the trial court did not abuse its discretion in allowing Yates to relate to the jury plaintiff's statement regarding how he sustained his injury.

## VI

Defendants next argue that the trial court improperly allowed plaintiff to elicit the expert testimony of Robert Lobodzinski. They assert that because he testified at trial inconsistent with his deposition testimony regarding the position of plaintiff's hands just prior to the accident, the trial court should have barred his testimony pursuant to Supreme Court Rule 220(d). 134 Ill. 2d R. 220(d).

The parties do not quarrel with the general rule that expert witnesses disclosed pursuant to Rule 220 may not offer testimony at trial which is inconsistent with their testimony given in a deposition (see *Mid-America Bank & Trust Co. v. Commercial Union Insurance Co.* (1992), 224 Ill. App. 3d 1083, 1088-89, 587 N.E.2d 81, 84-85, *appeal denied* (1992), 145 Ill. 2d 635, 596 N.E.2d 630), or that the trial court's decision whether to impose sanctions for Rule 220 violations is within the sound discretion of the trial court which will not be disturbed absent a clear abuse thereof. *Zajac v. St. Mary of Nazareth*

*Hospital Center* (1991), 212 Ill. App. 3d 779, 793-94, 571 N.E.2d 840, 849-50.

The record reveals that during his deposition, plaintiff testified that he had his left hand on the top of the ladder while he reached into the milk crate with his right hand. Lobodzinski, however, testified during his deposition, based on a previous conversation with plaintiff, that plaintiff reached into the crate with his left hand while holding on to the ladder with his right hand. Defendants moved the court prior to trial to find that plaintiff's statement during his deposition that he reached with his right hand constituted a judicial admission. The court granted defendants' motion; consequently, plaintiff related to the jury that he reached into the crate with his right hand just before the ladder gave way. On the morning that Lobodzinski was to testify, plaintiff's attorney informed the court that the expert was going to alter his testimony regarding the position of plaintiff's hands in order to conform with the court's ruling that plaintiff was bound by his judicial admission. At that point, defense counsel immediately objected, arguing that the expert would thus be changing his testimony in violation of Rule 220(d). The trial judge rejected this argument, and Lobodzinski based his opinions on the fact that plaintiff reached with his right hand instead of his left. The court also prohibited defendants from eliciting on cross-examination Lobodzinski's contrary deposition testimony, reasoning that once a judicial admission has been made, no contrary facts may be introduced into the record.

■ Defendants' argument that the court abused its discretion by allowing plaintiff's expert to testify is unavailing. While Lobodzinski did change a fact underlying his opinion, his opinion itself, that the ladder collapsed after plaintiff exerted torsion forces on it by reaching into the crate, did not differ from his deposition testimony. Defendants cannot successfully claim that they were prejudiced by Lobodzinski's testimony because they could not have been surprised by his giving the essential basis upon which he rested his opinion—that the ladder collapsed due to forces exerted thereupon by plaintiff when he reached into the crate. Moreover, defendants tendered no offer of proof as to whether the amount of torsion force would have produced a different result depending on which hand plaintiff used to reach into the crate; thus, whether plaintiff used his right or left hand does not appear to have been of any consequence. Accordingly, we hold that the trial court did not abuse its discretion in allowing Lobodzinski's opinion testimony.

■ Moreover, we disagree with defendants' contention that the trial court improperly limited their ability to cross-examine Lobod-

zinski. A judicial admission is a deliberate, clear, unequivocal statement by a party regarding a concrete fact within that party's peculiar knowledge. (*Kirby v. Jarrett* (1989), 190 Ill. App. 3d 8, 15, 545 N.E.2d 965, 969.) We have explained the nature of a judicial admission thus:

"[A judicial] admission is a formal act, done in the course of judicial proceedings, which waives or disposes with the production of evidence, by conceding for the purposes of litigation that the proposition of fact alleged by the opponent is true; it concerns a method of escaping from the necessity of offering any evidence at all, and is a waiver relieving the opposing party from the need of any evidence, and is conclusive in the sense that it formally waives all right to deny, for the purposes of the trial; *it removes the proposition in question from the field of disputed issues.*" (Emphasis added.) *Hudson v. Augustine's, Inc.* (1966), 72 Ill. App. 2d 225, 234-35, 218 N.E.2d 510, 515.

In the case *sub judice*, defendants, by requesting that the court find that plaintiff had made a judicial admission with respect to the position of his hands at the time of the incident, effectively "remove[d] the proposition in question from the field of disputed issues." Once defendants' motion was granted, the trial court correctly ruled that they could not attempt to reintroduce, for the purpose of impeachment or otherwise, the question of where plaintiff's hands were positioned shortly before his fall. Defendants could have fully preserved their right to cross-examine Lobodzinski on the issue of the location of plaintiff's hands had they not moved for the judicial admission finding, since in the absence of such a ruling, they could have simply impeached him or plaintiff on cross-examination if either of them contradicted their deposition testimony on direct examination regarding that issue. Accordingly, we hold that the trial court did not abuse its discretion in refusing to allow defendants to impeach plaintiff's expert on the question of the position of plaintiff's hands at the time of the accident.

## VII

■ Defendants' final assignment of error is the trial court's decision to prohibit their witness, Earl Records, from offering any opinion testimony. Defendants admit that they did not disclose Records, who was the chief engineer involved in the manufacture of the ladder, as a Rule 220 expert. However, they argue that because he was an employee of White Metal who was intimately related to the litigation,

defendants were not required to disclose him as an expert witness. See *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1992), 154 Ill. 2d 543, 547.

Defendants' argument is groundless. The record reveals that the trial court recognized that Records, as an employee intimately related to the case, was not a Rule 220 expert whom defendants were required to disclose. However, the court held that defendants were estopped from eliciting any expert testimony from him, irrespective of Rule 220, based on the following agreement between the parties prior to Records' deposition:

"For the record, [plaintiff's counsel] and I had a conversation yesterday as to the status of Mr. Records' testimony at trial.

Mr. Records is not being produced here today as an expert witness on behalf of White Metal as that term is understood, but rather as a person most knowledgeable concerning this particular ladder and would be the company representative at trial."

Plaintiff argued to the trial court that the essence of this agreement was that Records would not be offering any expert opinions at trial. Defendants responded that the agreement meant that pursuant to the "Wakeford exception" to Rule 220, Records would be offering expert testimony at trial, but that the parties recognized that because he was not a Rule 220 expert, he would not be bound by the constraints thereunder. The trial judge, after hearing argument, interpreted the predeposition agreement between counsel to mean the former, *i.e.*, that the parties understood that Records would not be offering any expert testimony at trial, and after reviewing the record, we cannot say that his decision that defendants were estopped from eliciting expert testimony from Records constituted an abuse of discretion.

For all of the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.