JACK TORNABENE, as Special Adm'r of the Estate of Rose M. Tornabene, Plaintiff-Appellee and Cross-Appellant, v. PARAMEDIC SERVICES OF ILLINOIS, INC., Defendant-Appellant and Cross-Appellee (Patricia Hutton *et al.*, Defendants).

First District (3rd Division)   No. 1—98—0333

Opinion filed June 14, 2000.—Rehearing denied July 14, 2000.

Cassiday, Schade & Gloor, of Chicago (Michael J. Morrissey, Catherine L. Garvey, Jennifer A. Keller, and Alison E. O'Hara, of counsel), for appellant.

Michael W. Rathsack, of Chicago (Patricia C. Bobb, Marina E. Ammendola, James N. Karahalios, and Michael W. Rathsack, of counsel), for appellee.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

Defendant appeals a substantial jury verdict for plaintiff. Plaintiff cross-appeals. We reverse and remand for a new trial because the jury received a nonpattern jury instruction on willful and wanton negligence that misstated the law in Illinois.

To resolve the principal issue in this case we must examine language contained in a nonpattern jury instruction tendered by plaintiff. Defendant objected to the instruction, but the objection was overruled and the instruction was submitted to the jury as a definition of willful and wanton misconduct. The instruction defined willful and wanton misconduct as: "a course of action which shows an utter indifference to or conscious disregard for the safety of others, or a course of conduct involving a failure, after knowledge of an impending danger, to exercise ordinary care to prevent a danger." Plaintiff insists the language accurately states Illinois law. We disagree.

The record reveals the following facts relevant to the issues raised in this appeal. Rose Marie Tornabene, the decedent, was a 57-year-old woman with a 35-year smoking history. Tornabene suffered a pneumothorax or collapsed lung in 1987, resulting in surgery. Tornabene was also diagnosed with chronic obstructive pulmonary disease, also known as emphysema. Tornabene's doctor believed that the disease had spread to both lungs.

Tornabene had difficulty breathing on August 23, 1992. She woke up coughing at 4 a.m. Jill Cook, Tornabene's daughter, called paramedics at about 4:05 a.m. Defendant Paramedic Services of Illinois (PSI) arrived at about 4:12 a.m.

Paramedics Stephen Swiatkiewicz and Patricia Hutton went to Tornabene's bedroom. Tornabene was in distress and signaling that she could not breathe. Cook testified she told Hutton that her mother had emphysema and had suffered a collapsed lung in 1987.

The paramedics measured Tornabene's vital signs, blood pressure and pulse, then put an oxygen mask on her. Tornabene was uncooperative and repeatedly pulled the mask off. Her condition worsened as the paramedics prepared to take her to the hospital. They struggled with

her to secure her to a stretcher. The paramedics spent 10 minutes in the house before taking her to the ambulance.

Tornabene was connected to a heart monitor and an EKG machine in the ambulance. Readings of her vital signs showed that her blood pressure, pulse and respiratory rate had dropped, symptoms of respiratory distress. The paramedics then tried to intubate her and assist her breathing with a bag valve mask. Tornabene lost consciousness in the ambulance, at about 4:25 a.m., 13 minutes after the paramedics had arrived at her house.

Paramedic Hutton called Resurrection Hospital and spoke to Nicoletta Ronstadt, an emergency room and mobile intensive care nurse (MICN). Hutton told Ronstadt about Tornabene's respiratory arrest, history of emphysema, shortness of breath, chest pain and unsuccessful attempts to intubate. The call ended at 4:28 a.m. Ronstadt did not tell the paramedics to immediately transport the patient because she knew they were treating the respiratory arrest. Hutton managed to reintubate Tornabene and assist her breathing at about 4:29 a.m.

Hospital records show that Tornabene arrived at the hospital at 4:35 a.m. in full cardiac arrest. Dr. Netanel Herscovitch, the emergency room physician, began CPR at 4:36 a.m. Tornabene became asystolic and unsalvageable at 4:45 a.m. Dr. Herscovitch decompressed Tornabene at 4:47 a.m. She was pronounced dead at 4:51 a.m.

Dr. Herscovitch examined Tornabene's X rays with the paramedics and told them that Tornabene's right lung had collapsed. He then told the family of Tornabene's death. Dr. Herscovitch told them that if Tornabene had arrived 10 minutes earlier, he could have saved her.

Plaintiff filed suit against PSI, the individual paramedics, Resurrection Hospital, Dr. Herscovitch and nurse Ronstadt. Plaintiff alleged negligence and willful and wanton conduct against PSI and the paramedics. Plaintiff settled with the hospital, emergency room doctor and nurse for $750,000 before trial. These parties were then dismissed with prejudice.

At a pretrial conference, PSI asked the court for a complete setoff against the hospital settlement in the event of a verdict for plaintiff. Plaintiff's attorney said she was not prepared to address the issue. The court said the issue would be resolved later.

PSI moved for summary judgment on the negligence counts, relying on the statutory immunity in the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/17(a) (West 1994)). The court granted the motion. The case went to trial only on PSI's alleged willful and wanton conduct.

Plaintiff moved, *in limine*, to exclude evidence of Tornabene's smoking history and application for disability benefits. The court

granted the motion. The court denied PSI's motion to limit the number of plaintiff's witnesses and to exclude Dr. Herscovitch's statement to the family. But the court reserved ruling on PSI's Rule 213(g) objection to expert testimony on salvageability. 166 Ill. 2d R. 213(g). The court told PSI the motion could be renewed at trial. PSI did not renew the motion, choosing not to call an expert witness on the issue, which might have led to the introduction on cross-examination of Tornabene's smoking history and application for disability benefits.

The evidence at trial established that pneumothorax happens when air escapes from a lung into the chest cavity. A pneumothorax is either spontaneous or trauma-induced. A spontaneous pneumothorax can happen to a person suffering from lung disease, such as emphysema.

Evidence was also introduced that pneumothoraxes are either "simple" or "tension." A "simple" pneumothorax does not compromise breathing. A "tension" pneumothorax causes pressure to build in the chest cavity. As a result, the lungs take in less air and the heart contracts. Symptoms of a tension pneumothorax include shortness of breath, chest pain, agitation, increased respiratory rate, decreased breath sounds and rapid heart rate. The treatment for a trauma or spontaneous tension pneumothorax is a needle decompression. The condition is fatal if untreated. A spontaneous tension pneumothorax is rare.

The evidence also established that PSI paramedics are required to follow the standing operating procedures (SOP) in their emergency medical services (EMS) system. The SOP are printed guidelines paramedics follow to treat patients in the field when a doctor is not present.

PSI is part of the Good Samaritan EMS system. The Good Samaritan SOP manuals are color coded. Respiratory problems are on blue pages. Trauma-induced injuries are found on green pages. Tension pneumothorax is listed in the green "Chest Injuries" section. Paramedics are instructed to perform a needle decompression for a trauma-induced tension pneumothorax. The SOP do not include guidelines for treating a nontraumatic, spontaneous tension pneumothorax. Dr. Joseph Hartman, the project medical director of the Good Samaritan EMS system, testified that because spontaneous tension pneumothoraxes are rare, paramedics are authorized to decompress only at the direction of a doctor. Dr. Hartman testified that this distinction explained why the treatment guideline for tension pneumothorax was found only in the trauma, and not respiratory, section of the SOP manual.

Both sides presented expert testimony about the paramedics' conduct and whether they violated the SOP.

PSI objected to plaintiff's nonpattern jury instruction on willful and wanton conduct. PSI also objected to the plaintiff's proffer of Illinois Pattern Jury Instructions, Civil, No. 105.01 (3d ed. 1995) (hereinafter IPI Civil 3d), defining professional misconduct, and IPI Civil 3d No. 10.02, defining ordinary care. These instructions were given over PSI's objections.

The jury returned a verdict for plaintiff on both the wrongful death and survival counts. The jury awarded plaintiff a total of $490,000 for wrongful death, $44,000 of which was economic damages, the remainder for loss of society. The jury awarded $352,884 on the survival count, $300,000 representing pain and suffering, $46,250 for loss of a normal life and $6,634 for funeral expenses. PSI asked for a setoff against the hospital settlement. The court granted the motion, setting off 58% of the wrongful death claim and 42% of the survival claim.

Defendant PSI raises 12 issues in this appeal. Plaintiff raises three issues in a cross-appeal.

PSI first argues that the jury was improperly instructed on the issue of willful and wanton conduct.

■ PSI, as a paramedic company, is entitled to the immunities under the Emergency Medical Services (EMS) Systems Act in effect at the time of the incident. See 210 ILCS 50/17(a) (West 1994). PSI could only be liable for acts performed "inconsistent with [the paramedic's] training" or for willful and wanton conduct. 210 ILCS 50/17(a) (West 1994). This case went to the jury solely on the issue of PSI's alleged willful and wanton conduct.

■ Supreme Court Rule 239(a) directs that an IPI instruction is to be used unless the trial court determines that the instruction does not accurately state the law. 134 Ill. 2d R. 239(a).

Plaintiff argues that the non-IPI instruction given combined the definition of willful and wanton conduct in IPI Civil 3d No. 14.01 and, in plaintiff's words, the "current definition" found in *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 641 N.E.2d 402 (1994). Plaintiff contends that *Ziarko* broadened the definition of willful and wanton conduct by recognizing that willful and wanton conduct "shares many *** characteristics *** of ordinary negligence." *Ziarko*, 161 Ill. 2d at 275. We believe plaintiff has misread *Ziarko*.

In *Ziarko*, our supreme court did not broaden or contract the definition of willful and wanton conduct in Illinois law set out in *Schneiderman v. Interstate Transit Lines, Inc.*, 394 Ill. 569, 69 N.E.2d 293 (1946). The *Ziarko* majority pointed out that willful and wanton conduct can be either intentional or reckless. *Ziarko*, 161 Ill. 2d at 274-79. The court then addressed the main issue in the case (which

has nothing to do with the case at hand) and held that when reckless, rather than intentional, conduct is the predicate for a willful and wanton finding, the party subject to such a judgment may seek contribution from a defendant who is merely negligent. *Ziarko*, 161 Ill. 2d at 279.

The *Ziarko* court analyzed the common law and purpose of the Joint Tortfeasor Contribution Act (740 ILCS 100/2(a) (West 1992)) to reach this conclusion. The court first found that intentional tortfeasors were not entitled to contribution under either common or statutory law. *Ziarko*, 161 Ill. 2d at 272. The court then looked to the differences and similarities between negligent, reckless and intentional conduct. *Ziarko*, 161 Ill. 2d at 272. It was here that the *Ziarko* court noted that ordinary negligence and willful and wanton conduct "share many similar characteristics." *Ziarko*, 161 Ill. 2d at 275. But this comment did not delete the requirement for intentional conduct or recklessness as a component of a willful and wanton finding. The comment, rather, reaffirms the rule that there is a difference between willful and wanton conduct that is intentional rather than reckless. *Poole v. City of Rolling Meadows*, 167 Ill. 2d 41, 49, 656 N.E.2d 768 (1995).

■ Plaintiff's claim that *Ziarko* changed the definition of willful and wanton conduct is further undermined by the *Ziarko* court's favorable citation to *Schneiderman* for a definition of willful and wanton conduct. *Ziarko*, 161 Ill. 2d at 273. In *Schneiderman*, our supreme court said:

> "A willful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." *Schneiderman*, 394 Ill. at 583.

We also note that the *Ziarko* court cited favorably to IPI Civil 3d No. 14.01 as the appropriate instruction to give in a willful and wanton case. *Ziarko*, 161 Ill. 2d at 279. When there is no evidence of a deliberate intention to harm, IPI Civil 3d No. 14.01 should be given to the jury in the following form:

> "When I use the expression 'willful and wanton conduct' I mean a course of action which shows an utter indifference to or conscious disregard for a person's own safety."

Plaintiff's instruction instead uncouples the definition set out in *Schneiderman*, reaffirmed in *Ziarko* and incorporated in IPI Civil 3d No. 14.01, and reformulates the instruction to carve out an exception to fit PSI's conduct in this case.

■ *Schneiderman* held that willful and wanton conduct could be intentional or a reckless disregard for safety, *such as failing to discover or prevent a danger.* But plaintiff's instruction defines willful and wanton conduct in the disjunctive: either a conscious disregard for safety *or* a failure to discover a danger. Plaintiff rewrites the *Schneiderman* definition of willful and wanton conduct as it is now recognized and converts the issue to one of ordinary negligence. It is not an accurate statement of the law. The instruction is also misleading in that it suggested the issue in the case was a "failure to exercise ordinary care." That was not the issue. The issue was whether the care the paramedics provided was willful and wanton.

Plaintiff's instruction might have survived scrutiny if the evidence showed, for example, that the paramedics stood by in the bedroom, oxygen at hand, and did nothing but watch while this unfortunate woman struggled for breath. It would have survived if while transporting her to the hospital they stopped for a coffee break.

In fact, the evidence here showed the paramedics exercised ordinary care to prevent danger to this woman. The only negligence with which they could be charged under the facts of this case is that they exercised ordinary care, but did so negligently. It is from this latter definition of negligence that the immunity statute shields them.

IPI instructions are to be used unless the court determines that the instructions do not accurately reflect the law. *Ruffiner v. Material Service Corp.*, 116 Ill. 2d 53, 62, 506 N.E.2d 581 (1987). The court erred in not issuing IPI Civil 3d No. 14.01. 134 Ill. 2d R. 239(a). Use of an improper instruction may lead to reversible error. See *Podoba v. Pyramid Electric, Inc.*, 281 Ill. App. 3d 545, 667 N.E.2d 167 (1996) (case remanded for new trial where non-IPI instruction rendered instruction repetitious as a whole and emphasized plaintiff's preexisting condition).

We reverse and remand this case for a new trial based on the erroneous willful and wanton instruction. Several other issues could arise on remand. We give the following directions.

■ PSI objected to the court's use of IPI Civil 3d No. 105.01, defining professional misconduct, and IPI Civil 3d No. 10.02, defining ordinary care. We agree that these negligence instructions have no application in a willful and wanton case. Should a retrial occur based on the same evidence, the court is directed to give only IPI Civil 3d No. 14.01 on the liability issue.

PSI objected to plaintiff's "loss of a normal life" instruction, arguing that plaintiff could not prove that Tornabene experienced regular aspects of life between 4:15 a.m. when the paramedics arrived and 4:45 a.m. when she died. PSI relies on *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 631 N.E.2d 1269 (1994).

The *Smith* court categorized "loss of a normal life" as an element of damages. *Smith*, 260 Ill. App. 3d at 938. The *Smith* court suggested that the "loss of a normal life" element be used in place of "disability" to minimize jury confusion and ensure accurate verdicts. The court reasoned that "disability" has a common meaning and overlaps with other damage categories, possibly resulting in under- and over-compensation. *Smith*, 260 Ill. App. 3d at 938.

*Smith* was analyzed by *Torres v. Irving Press, Inc.*, 303 Ill. App. 3d 151, 707 N.E.2d 248 (1999). The *Torres* court respectfully disagreed with *Smith*'s conclusion. The court found that the question of what is a "normal life" is too subjective a standard that makes damages difficult to quantify. *Torres*, 303 Ill. App. 3d at 157. The court then concluded that the Illinois Supreme Court's recommended disability instruction in IPI Civil 3d No. 30.04 should be given instead of one on "loss of normal life." *Torres*, 303 Ill. App. 3d at 157-58. We believe that *Torres* is an accurate statement of Illinois law. The trial court is directed to issue IPI Civil 3d No. 30.04, should the issue arise on remand.

■ PSI also objected to the trial court's limitation of Dr. Joan Boomsma's potential testimony, preventing her from discussing Tornabene's 35-year smoking history and that Tornabene applied for social security disability benefits. PSI also suggests that the trial court erred in ruling that plaintiff would be allowed to cross-examine Dr. Boomsma on opinions not disclosed by PSI.

The record shows that Dr. Boomsma did not testify at trial. PSI withdrew Dr. Boomsma as a witness after the trial court ruled that it would allow plaintiff's anticipated cross-examination. The record shows that, while the trial court suggested it would allow the cross-examination, ruling on this issue was reserved. The trial court said that the ultimate scope of plaintiff's cross-examination depended on the context of PSI's direct examination. The court then ruled that Dr. Boomsma could not attribute Tornabene's emphysema to her 35-year smoking history and could not mention the words "social security disability."

Plaintiff argues that PSI waived this issue when it failed to call Dr. Boomsma at trial. We agree. PSI's failure to present Dr. Boomsma's testimony prevents us from determining whether the court's *in limine* ruling limiting the testimony prejudiced PSI. To hold otherwise would require us to speculate about the harm that might have been caused by the court's *in limine* ruling. See *People v. Chatmon*, 236 Ill. App. 3d 913, 604 N.E.2d 399 (1992).

■ PSI's objection to the trial court's ruling that plaintiff would be allowed to cross-examine Dr. Boomsma on opinions not disclosed under

Supreme Court Rule 213(g) is also moot. An issue is moot when issues involved in the trial court no longer exist, making it impossible for the reviewing court to grant effectual relief to the complaining party. *Johnson v. Edgar*, 176 Ill. 2d 499, 511, 680 N.E.2d 1372 (1997). The record shows that the court reserved ruling on the Rule 213(g) issue and left the door ajar to allow PSI to renew its objection at trial. PSI chose to withdraw the witness. PSI's trial strategy removed the issue of an alleged Rule 213(g) violation.

■ PSI objects to admission of the hearsay statement of Dr. Herscovitch as an excited utterance. We agree. We believe it was clear error to admit the statement—that he could have saved Tornabene if she had arrived 10 minutes earlier—as an excited utterance. The record shows that Dr. Herscovitch did not make the statement while subject to the excitement of the event, but had time to reflect upon what had happened. The circumstances also suggest self-interest in making the statement. See *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 618 N.E.2d 909 (1993).

■ PSI objects to plaintiff's presentation of cumulative expert testimony and claims that plaintiff should have been limited to two witnesses. The issue is left to the sound discretion of the trial court. See *Leonardi v. Loyola University*, 168 Ill. 2d 83, 92, 658 N.E.2d 450 (1995). The trial court did not abuse its discretion in allowing more than two experts to testify in plaintiff's case.

PSI next argues that the cumulative effect of the errors requires a new trial. We need not address this issue. Reversal is warranted on the erroneous willful and wanton instruction issue alone.

■ We also decline to find the verdict against the manifest weight of the evidence or enter a judgment notwithstanding the verdict. Whether PSI engaged in willful and wanton conduct is a question of fact for a properly instructed jury. *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 326, 659 N.E.2d 1322 (1995).

In the cross-appeal, plaintiff argues that: (1) PSI is not entitled to a setoff against the hospital settlement; (2) the court should have given IPI Civil 3d No. 30.21; and (3) summary judgment on the negligence counts should be reversed if the case is remanded for a new trial. Since these issues may also arise on remand, we give the following instructions.

■ Even if we were to agree with plaintiff that PSI's failure to allocate the settlement before trial forecloses its right to set off the verdict, our decision to remand this case for a new trial moots plaintiff's argument. The court is directed to allocate the hospital settlement before trial. *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 654 N.E.2d 1365 (1995).

■ Plaintiff next argues that a new trial on damages is warranted because the court erred in refusing to give IPI Civil 3d No. 30.21. This instruction prevents a jury from limiting damages because of a preexisting condition. IPI Civil 3d No. 30.21. Plaintiff argues that, given Tornabene's documented history of emphysema, the jury could have attributed her death to complications from the disease as well as PSI's negligence and limited damages recovered.

Refusal to give an instruction does not entitle a party to a new trial absent a finding that the party was seriously prejudiced by the denial of an instruction. *Strawder v. City of Chicago*, 294 Ill. App. 3d 399, 403, 690 N.E.2d 640 (1998). Plaintiff here failed to show how refusal to give IPI Civil 3d No. 30.21 prejudiced him or resulted in a reduced verdict. We find no abuse of discretion in refusing to give IPI Civil 3d No. 30.21 to the jury.

■ Last, plaintiff argues that summary judgment on the negligence counts was improper. We review summary judgment *de novo. In re Estate of Hoover*, 155 Ill. 2d 402, 411, 615 N.E.2d 736 (1993).

■ The immunity under section 17(a) of the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/17(a) (West 1994)) applies so long as paramedics act consistently with their training and refrain from willful and wanton conduct.

Plaintiff argues that his negligence claim was premised on the allegation that the PSI paramedics acted inconsistently with their training when they failed to decompress Tornabene once they recognized she was suffering from a collapsed lung.

This argument turns on the meaning of "inconsistent with the person's training," as that phrase is used in the statute. 210 ILCS 50/17(a) (West 1994). We note that there is no case law interpreting this phrase, nor is the phrase defined in the statute. We also note that the phrase at issue here was deleted in a recent amendment to the statute.

In *Meck v. Paramedic Services*, 296 Ill. App. 3d 720, 695 N.E.2d 1321 (1998), the allegations of conduct inconsistent with training were characterized in the plaintiff's pleadings as examples of willful and wanton misconduct. They do not appear to have been pled as separate causes of actions that required only allegations of negligence to survive. *Meck*, then, is not of much help to us. In that case the allegations of conduct "inconsistent with training" were not pled as separate causes of action sustainable under ordinary negligence.

The trial court in this case granted summary judgment on the negligence count of the complaint, which contained seven allegations of negligence alleged to be "inconsistent with training." We review summary judgment *de novo. Petrovich v. Share Health Plan of Illinois,*

*Inc.*, 188 Ill. 2d 17, 30, 719 N.E.2d 756 (1999). The first six of these allegations suggest that in the course of treating their patient the paramedics made "medical judgments" or "decisions" or "diagnoses" at various points in treatment in contravention of written orders. The sixth allegation alleges they failed to recontact the hospital when they were ordered to do so. The eighth allegation is a wholly conclusory allegation that they failed or refused to follow written and verbal medical orders.

If we define "inconsistent with training" as an act or omission one would expect to encounter as a paramedic, the allegations of the complaint are sufficient to survive a motion for summary judgment. But the language is contained in an immunity statute that shields paramedics from the ordinary negligence to which they might be vulnerable in the context of the work they do. If the phrase is interpreted as embracing negligent acts and omissions encountered in paramedic emergency treatment, the immunity under the statute is wholly illusory. We believe a more appropriate analysis is one that requires evidence of an act or omission that one would never expect to occur, even under the pressure of emergency treatment. Under this analysis, the allegations and evidentiary materials at summary judgment reveal nothing inconsistent with paramedic training. The allegations that the PSI paramedics knowingly ignored orders or withheld treatment that they knew was appropriate under the circumstances are conclusory and unsupported by the record. Summary judgment on the negligence count was appropriate. The immunity in section 17(a) applies. See *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 677 N.E.2d 985 (1997).

We reverse and remand for a new trial consistent with the directions in this opinion.

Reversed and remanded with instructions.

CERDA and WOLFSON, JJ., concur.