THOMAS TULGETSKE, Plaintiff-Appellee, *v.* R. D. WERNER CO., INC., *et al.*, Defendants-Appellants.

Fifth District   No. 79-84

Opinion filed August 5, 1980.

Listeman, Bandy & Hamilton Association, of Belleville, and Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, of counsel), for appellants.

G. Edward Moorman, of East Alton, for appellee.

Mme JUSTICE SPOMER delivered the opinion of the court:

A jury trial of plaintiff Thomas Tulgetske's strict tort liability action in the Circuit Court of Madison County ended in a $350,000 verdict in his favor. Tulgetske suffered serious personal injuries, including the loss of the lower portion of his right leg, after a fall from a ladder manufactured by defendant R. D. Werner Co. and sold by defendant Montgomery Ward & Co. On appeal, the defendants contend that the court below should have directed a verdict in their favor because of the plaintiff's failure to prove that any defect in the ladder was the proximate cause of his injuries; that the court erred in admitting certain expert opinion testimony; and that the jury's verdict was against the manifest weight of the evidence.

The plaintiff had borrowed the aluminum extension ladder—which is 20 feet long fully extended—from a neighbor, Jack Fredrick Ladd, in order to make repairs to the roof of a mobile trailer for Zobrist Trailer Company. Ladd testified that he purchased the ladder in 1969, but had seldom used it. Plaintiff had borrowed it approximately four times, and the ladder was in good condition when plaintiff borrowed it on January 31, 1974, the day of the accident.

Just prior to the accident plaintiff placed the ladder against the trailer, with its base 3 to 3½ feet from the trailer, and approximately 2½ feet of the ladder extending above the roof of the trailer. The surface of the area was crushed gravel and level, with no snow or ice on the ground. Plaintiff climbed the ladder 10 or 12 feet to inspect the roof. In getting from the ladder to the roof, he moved his feet to the left side of the rung,

then moved his left leg off the ladder, placed his left knee on the roof and brought his right leg around to the left of the ladder, placing his right knee on the roof. He observed the area to be repaired and returned to the ground without incident. Plaintiff again made a visual examination of the ladder and its placement and found it stable. It appeared at that time to be in good condition. He put his tools in his coverall pockets and climbed back up the ladder. As he began to dismount to get on the roof, he first moved his hands and feet to the left, then raised his left foot behind him. He then felt the ladder "give way and crunch" beneath him. His hands were on the roof as he felt the ladder give way, going down underneath him. He remembered grabbing for the trailer and falling, and with his "right foot more or less, I kicked the ladder." He was unable to hold onto the roof and fell down alongside the trailer. The ladder went off to the right.

There were no eyewitnesses to the accident. Plaintiff recalled that Douglas Becker, a truck driver for Zobrist, responded to his cry for help, and he recalled "cussing the ladder and saying, 'The ladder buckled on me.'" Plaintiff testified that he observed the leg of the ladder was bent in. On cross-examination he testified, "* * * in a split second I don't know what I did, but I believe I kicked the ladder to the right."

Becker testified that he found plaintiff on the ground with the ladder lying on top of him. He testified that plaintiff "said the ladder gave away and he fell." He picked up the ladder and noticed that the base of the left leg was bent in toward the inside of the ladder. He noticed the bone sticking out of plaintiff's leg and left to call an ambulance.

Harvey Steinkoenig, a witness for plaintiff, testified he was working for Zobrist Trucking on the day in question and instructed plaintiff to repair the roof of the trailer. The next time he saw plaintiff, he was lying on the ground hollering for help. He testified that plaintiff was swearing at the ladder and saying it buckled. He observed the left leg of the ladder was bent inward.

Dr. Lawrence McAneny, a professor of physics at Southern Illinois University, was called as an expert witness on behalf of the plaintiff. He had examined the ladder in question, was familiar with the standards considered by the engineering profession to set forth the accepted strength requirements for ladders, and had performed a cantilever bending test on the right rail of the base section of the ladder. The purpose of that test was to measure the resistance of the rail to bending or deformation of generally, but not quite, the type that the left side rail had undergone, thus testing the strength of the base of the ladder or side rails of the ladder. The witness testified that a medium-duty ladder should be able to withstand a 150-pound force deflecting the side rail without any permanent deformation, and a heavy-duty ladder, 200 pounds. He tested

up to 150 pounds. With a load of 100 pounds, the deflection was .939 of an inch. When the load was then released, a permanent deflection of .18 of an inch remained. Dr. McAneny testified that the deflection which resulted when it was loaded—almost an inch—was not in itself "terribly serious" if it had returned to its original configuration when the load was released, but it did not; it was permanently bent by this force and should not have been. When the rail was reloaded to 150 pounds, the witness observed that the deflection was 1.22 inches; and after the load was released, a permanent deflection of .26 of an inch remained, or a little over one-quarter of an inch. On the basis of the test and the published standards of the Underwriters Laboratory and the American Society for Testing Materials, he concluded that the side rail had insufficient resistance to the bending.

In response to a hypothetical question, Dr. McAneny concluded, based on his training, his knowledge of the laws of physics, and his examination and testing of the ladder and of the facts in evidence, that the ladder had undergone a progressive failure of its left rail. In his opinion, lateral forces were produced on the side rails when the person on the ladder, in moving to the left to dismount, started or stopped moving sideways. The lateral forces caused a deflection of the rail which, in combination with the forces exerted longitudinally along the rail, resulted in a "couple" leading to what he referred to as a "bending moment." He described a couple as a pair of forces which are parallel in opposite directions but not colinear; they are not in a straight line and do not meet.

Dr. McAneny stated that the deflection on the basis of his testing would be a progressive one and would result in the failure which is observed in the ladder. He stated:

"[I] cannot imagine a situation in which a man could try to get off a ladder without moving, and if he started to move, there would be a lateral force. If he stopped moving to the side, there would be a lateral force. These lateral forces would result in a deflection. I think my tests would indicate that whenever there are such lateral forces there would be deflection, whether permanent or elastic, and that such a deflection would then introduce a couple on the basis of the load-bearing capacity of the rail, and that is forced down on the rail due to the man's weight and the ladder's weight and the reaction to that from the ground at the bottom of the rail. And this couple would result then in increasing the deflection. Once a permanent set began, in other words, once the elastic limit had been exceeded, the material would undergo progressive failure until the forces were removed."

When asked on cross-examination if the result of the couple was a lateral force, the witness replied, "No, sir, it's a bending moment," which

he explained is produced by the vertical forces in the side rail being put out of line by deflection in the rail. He stated that the distance from the bottom rung to the bottom of the ladder was approximately 12 inches, and that the ladder would have been considerably more resistant to the failure which he observed—that is, the lower leg bent inward—had its lowest rung been placed nearer the bottom of the rails. If the bottom rung were lowered approximately six inches, thus making the cantilever section, or base section, only one-half as long as it now is, the lateral force that the rail could withstand would be doubled; the rail could withstand the same lateral force with only half the deflection. According to this witness, the ladder would have to have been tipped about 12 degrees to the left to produce the bend that occurred in the rail.

Dr. Harry Duffey, a professor of engineering and director of the civil engineering program at Southern Illinois University, testified as an expert witness for the defendant that the bending deformation of the ladder in question would be produced by a lateral force, a force which is perpendicular to the side of the ladder. Assuming a 160-pound man is standing 10 feet high on a ladder, and the ladder moves to the right two inches, there is lateral force on the right lower side rail, but none on the left rail. The lateral force will be on the leg which is still in contact with the ground. The instant there is any motion of the ladder to the right, the left leg raises off the ground, and there are no forces on it. Assuming the top of the ladder continues to move to the right, the maximum lateral force on the lower right rail will be reached when the ladder has moved sufficiently to the right so that the center of gravity of the man is exactly over the point at which the right side rail is in contact with the ground. The maximum lateral force at this point is approximately 20 pounds. Dr. Duffey testified that based upon the facts in evidence, as presented to him in a hypothetical question, there were no forces capable of producing the lateral bending exhibited in the ladder. He stated that in his opinion it would take a minimum force of 200 pounds to produce the deformity shown. When asked on cross-examination which would hit the ground first—where neither falls on the other—the top of a ladder which is standing up and being supported on the lower end by the earth or a man standing on the ladder, where both begin to fall at exactly the same time, Dr. Duffey replied that the man would touch first. Dr. McAneny testified to the same effect. Neither expert found any metallurgical defect in the composition of the ladder.

The issues raised by the defendants are interrelated in that they all rest on the defendants' contention that there was no evidence that the ladder moved to the left. Therefore, the arguments go, since the plaintiff failed to prove that the alleged defect in the ladder was the proximate cause of his fall and resulting injury, there was insufficient evidence on

which the expert could base his opinion, and the jury's verdict was contrary to the manifest weight of the evidence.

We agree with the plaintiff that the defendants' argument "fails to appreciate the inherent limitations of language and memory to describe an experience such as that undergone by plaintiff." We think that the plaintiff's testimony was sufficient for the jury to conclude that the ladder did move to the left when it went "down underneath" him after he had moved to the left, and that he then kicked it and it went to the right.

Much argument of a rather technical nature is indulged in in the briefs, but we do not think that this court is the correct forum for such factual and scientific disputes to be resolved. The jury heard the expert testimony presented by both sides and was asked to decide whether it was true, as plaintiff claimed, that the defective condition of the rails caused the left side rail to fail while he was on the ladder, thus causing his fall and injury, or whether—as defendants claimed—plaintiff's version of how the accident occurred was "inherently improbable." Clearly, the questions of fact were properly submitted to the jury (*Reynolds v. American Oil Co.* (1975), 32 Ill. App. 3d 905, 911-12, 337 N.E.2d 403, 407), and the jury resolved them in favor of the plaintiff. There is no requirement that plaintiff must disprove all other possible causes. *Spotz v. Up-Right, Inc.* (1972), 3 Ill. App. 3d 1065, 280 N.E.2d 23; *Pearson v. Ford Motor Co.* (1975), 32 Ill. App. 3d 188, 336 N.E.2d 528.

Although mere proof of injury while using a ladder manufactured and sold by the defendants is not enough to prove a cause of action sounding in strict liability in tort, a plaintiff can make a *prima facie* case by proof that in the absence of abnormal use or reasonable secondary causes the product failed to perform in the manner reasonably to be expected in light of its nature and intended function. (*Gillespie v. R. D. Werner Co., Inc.* (1978), 71 Ill. 2d 318, 375 N.E.2d 1294; *Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401.) We agree with the plaintiff that he did submit such proof. Even in the absence of the expert testimony presented by plaintiff, there was evidence that the plaintiff inspected the ladder, and it appeared to be in good condition; that he placed the ladder firmly on solid ground in a stable position; that his use of the ladder was normal and foreseeable; that he felt the ladder give way and "crunch" beneath him; that he fell to the ground with the ladder on top of him, observing that the left rail was "bent in." Plaintiff's testimony is corroborated by two witnesses who saw him on the ground underneath the ladder and heard him state—while in great pain from his injury—that the ladder gave way, causing his fall. Given this evidence, we find that it was reasonable for the jury to conclude that there was no abnormal use and that the ladder failed to perform in the manner reasonably to be expected in the light of its intended function.

We find the jury's verdict is not against the manifest weight of the evidence and the trial court did not err in admitting the opinion testimony of plaintiff's expert. Accordingly, the judgment of the circuit court of Madison County is hereby affirmed.

Affirmed.

KASSERMAN and KARNS, JJ., concur.