2023 IL App (1st) 210676-U
No. 1-21-0676

FIRST DIVISION
August 14, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CARLOS PIKE, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ABSS MANUFACTURING CO. and SUNSET LADDER CO., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| _____ | ) | No. 17 L 5250 |
| Freeman Electrical, Inc. and Freeman Expositions, Inc. f/k/a Freeman Decorating, Inc. | ) | |
| | ) | |
| Defendants and Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ABSOLUTE I&D, INC., ABSOLUTE EXHBITS, INC., RED SUN FARMS, INC., | ) | The Honorable |
| | ) | Irwin J. Solganick, |
| Third-Party Defendants. | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

*Held*:     We affirm the trial court's order granting summary judgment to defendants-appellees ABSS Manufacturing, Inc. and Sunset Ladder Co. with respect to plaintiff's strict liability claim based on a ladder collapse. The evidence does not permit an inference of product defect to support plaintiff's claim of strict liability because (1) there is undisputed evidence of plaintiff's abnormal use of the ladder at issue and (2) plaintiff cannot show that there was no reasonable secondary cause of his injury.

¶ 1     In this product liability action stemming from a ladder collapse, plaintiff-appellant Carlos Pike appeals from the circuit court order granting summary judgment to defendants-appellees ABSS Manufacturing, Inc. (ABSS) and Sunset Ladder Co. (Sunset). We conclude the undisputed evidence could not support an inference of a manufacturing defect in the subject ladder, as the evidence did not show the absence of abnormal use or reasonable secondary causes of Pike's injury. Accordingly, we affirm the entry of summary judgment for ABSS and Sunset.

¶ 2                                                   BACKGROUND

¶ 3     This case stems from an incident in which Pike was injured while climbing a ladder in the course of working to set up a trade show booth. At the time of the incident, Pike was working as a union carpenter for Absolute I&D (Absolute), a company that builds and installs exhibits for trade shows.[1] Absolute was hired to set up a booth for Red Sun Farms at the United Fresh Produce Association trade show at the McCormick Place convention center.

¶ 4     On June 7, 2015, Pike was working to set up the Red Farms booth with Charles Brown, an electrician employed by Freeman Electrical, Inc. (Freeman). Brown was tasked with installing wiring through "raceways" or soffit near the ceiling of the booth. In order to do so, Brown retrieved an 8-foot fiberglass stepladder that was owned by Freeman.

---

[1] Absolute is not a party to this appeal, although it was sued as a third-party defendant in the underlying action. The merits of the third-party complaint are not at issue in this appeal.

¶ 5    The ladder was manufactured in February 2013 by ABSS and subsequently sold by Sunset, a ladder distributor, to Freeman. It is undisputed that the ladder had a load capacity of 300 pounds, and the ladder was labeled as such.[2] It is also undisputed that Pike weighed approximately 350 pounds at the time of his injury.

¶ 6     For about one hour preceding the incident, Brown used the ladder to run electrical wiring through a number of pre-cut "mouse holes" at various points in the booth. At one point, while he was standing on the ladder's fifth step, Brown informed Pike that he was having difficulty running wiring through one of the "mouse holes." Brown descended the ladder, and Pike began to climb it so that he could inspect the area. As he was climbing the third or fourth step, the ladder collapsed and Pike was injured.

¶ 7    On May 17, 2017, Pike filed a complaint naming as defendants ABSS, Sunset, Freeman, and Freeman Expositions. Counts I and II (which are not at issue in this appeal) alleged various negligent acts by Freeman and Freeman Expositions. In count III of the complaint—the only count at issue—Pike alleged a claim of "strict product liability" against ABSS and Sunset, as manufacturer and distributor of the ladder. Pike alleged that, when the ladder was placed in the stream of commerce, it was "in a defective and unreasonably dangerous condition in one or more of the following respects:

    a) the stepladder was structurally unsound and unsafe;

    b) the stepladder did not meet industry design standards;

    c) the stepladder did not meet manufacturing specifications;

    d) the stepladder failed to contain adequate warnings regarding weight limitations;

---

[2] A label on the ladder stated that its "DUTY RATING" was TYPE 1 A" and "LOAD CAPACITY: 300 LBS."

e) the materials used in the manufacture of the stepladder were defective;

f) the stepladder failed when used in an intended and reasonably foreseeable manner."

Pike alleged that he was injured as a proximate result of the ladders' "defective and unreasonably dangerous conditions"

Brown and Pike's Deposition Testimony

¶ 8 The parties conducted a number of depositions, including those of Brown and Pike. In his deposition, Brown testified that because he was doing electrical work for Freeman at the time of the incident, he was required to use a ladder provided by Freeman. On the day of the incident, he selected the ladder from a bin of Freeman-owned ladders. He "checked it first" and "found a sturdy ladder." When asked how he checked the ladder, Brown said he opened the ladder, and its "stiffness" let him know that the "cross brace was good." He did not notice any breaks or defects in the ladder before he began to use it.

¶ 9 For approximately one hour before Pike's injury, Brown ascended and descended the ladder a number of times in the course of installing wiring through a number of mouse holes. Brown did not have any problems using the ladder. Brown stated that at the time, he weighed between 225 and 230 pounds.

¶ 10 Shortly before Pike's injury incident, Brown was on the ladder when he informed Pike that he was having difficulty running an extension cord through a mouse hole, because the hole was too small. Pike told him to come down so that Pike could inspect the area. Brown climbed down the ladder, and Pike "immediately" started up the ladder. Pike did not stop to read the labels on the ladder.

Brown heard cracking when Pike reached the third step of the ladder, and the "ladder just collapsed." Brown did not see any cracks or damage to the ladder before Pike used it.

¶ 11    In Pike's deposition, he likewise testified that Brown used the ladder for at least an hour before the incident, and that Brown climbed up and down the ladder without any problems. Just before the incident, Brown told him a "hole was too small" to run electrical cord through. According to Pike, Brown came down the ladder and told Pike to "go up and take a look yourself." Pike stated that he "went right up the ladder to take a look." Pike testified that he did not inspect the ladder before he climbed on it, because Brown had not had any problems using it: "Charlie Brown was on this ladder, so I did not expect this particular ladder – I guess you could say I assumed it was safe like all the other ladders that I've used over the years, especially since Charlie Brown is about the same size as me and had been using it all day."

¶ 12    Pike recalled that as he started to go up the ladder, "it just collapsed under me" when he was at the third or fourth step. Pike testified that the ladder's cross braces were down and locked in place before he started climbing, and that his hands were on the side rails as he began climbing. He denied hearing any creaking or cracking sounds before it collapsed.

¶ 13    Pike denied that he ever received any "formal training" on how to use ladders safely from Absolute or any contractor he worked for. During his deposition, Pike estimated that he weighed approximately 305 to 310 pounds at the time of the accident. However, the parties do not dispute that, according to medical records, he actually weighed approximately 350 pounds at the time of the incident.[3]

---

[3] Pike also acknowledged that he had right knee surgery in 2013, left knee surgery in 2014, and a laminectomy in February 2015, approximately four months before the incident. However, he denied that his knees were bothering him and stated that his back was "fine" at the time of the incident.

¶ 14    Pike testified that he did not inspect the label on the ladder and did not know its duty rating before he climbed it:

> "Q. Were you aware of what the duty rating was on the ladder that was involved in your accident?
>
> A. No, sir.
>
> Q. If I told you this was the label on your ladder and that your ladder had an extra heavy industrial duty rating of 1A with a working load of 300 pounds, you would understand what I mean, right?
>
> A. I would understand what you mean, yes sir.
>
> Q. Were you aware that you weren't supposed to load the ladder in excess of 300 pounds at the time you used it?
>
> A. No, because I didn't know if it was a 1A or a 1AA.
>
> Q. Because you didn't inspect those labels?
>
> A. Correct."

¶ 15    Pike also testified that he did not know if he would have used the ladder, even had he seen the label indicating that its duty rating was 300 pounds. When asked why he might use a ladder with a 300-pound duty rating when he weighed more than 300 pounds, Pike responded: " I've been on ladders for the last 30 years, I've never had an issue. I didn't even know that there was a ladder on the show floor that couldn't carry 300 pounds because 80 percent of the guys down there are my size and I've never seen that."

¶ 16    **Deposition Testimony of Bradley Becnel on behalf of ABSS and Sunset**

¶ 17 Bradley Becnel testified that he was the sole owner of Sunset and that he had been a "50/50" partner in ABBS, along with Nasir Ahmed. Ahmed unexpectedly passed away in October 2018, while this case was pending.

¶ 18 Becnel testified that he was "at the sales end" of ABSS but had little involvement with ABSS' manufacturing process. Becnel identified documents reflecting that in February 2013, Freeman ordered a number of ladders from Sunset, which were manufactured by ABSS. That order included the ladder involved in Pike's injury. Becnel agreed that the labeling on the ladder involved in Pike's incident indicated it was manufactured by ABSS in February 2013, and that its load capacity was 300 pounds.

¶ 19 Becnel testified that the ladder at issue used a "standard" design that had existed for many years before ABSS was a company. According to Becnel, "[v]irtually all ladder companies make an extremely similar product."

¶ 20 Becnel testified that Ahmed ensured that ladders manufactured by ABSS complied with standards from the American National Standards Institute (ANSI) and Occupational Safety and Health Administration (OSHA). Becnel identified ABSS ladder testing protocols from 2004 and 2017, which were the only relevant testing documents ABSS had located. Becnel indicated that Ahmed would have known about additional testing. ABSS had searched Ahmed's computer but had not found other testing documentation for 8-foot ladders. Becnel believed that ABBS had performed additional testing, but he lacked personal knowledge as to how often testing was done.

¶ 21 Becnel agreed that the ladder's labeling indicated a load capacity of 300 pounds. Becnel testified that a user should not exceed the stated capacity rating for a ladder:

> "Q. Do you know [what] the capacity rating is for an extra heavy-
> duty ladder?

A. Yes.

Q. What are those?

A. 300 and 375 would both be extra-heavy duty.

Q. Do you know what that means when it says 300 and 375 pounds?

A. Yes, that's the capacity that you're not supposed to exceed.

Q. On what?

A. On the ladder, period."

¶ 22　However, Becnel also agreed that ABSS ladders are expected to be able hold more weight than their stated capacity:

"Q. Were you aware that ladders were manufactured to exceed a 300-pound standard?

A. Yes.

Q. Do you know what the maximum load is on a stair for your ladders?

A. Not offhand, no.

Q. Is it fair to say there is sometimes double and triple redundancy built into these ladders?

A. Yes.

Q. So your ladders are designed to basically hold up to 900 or 1200 pounds?

A. Yes, absolutely.

Q. So if a 300-pound guy walked on that ladder, it shouldn't fail?

A. Yes.

[ABSS COUNSEL] I will show an objection to walk on that ladder.

Q. If a 375-pound guy walked on that ladder, onto that ladder, it should not fail?

A. Correct.

[ABSS Counsel]: I'll show the same objection, but with that objection, form and foundations. If you understand the question, sir, go ahead.

THE WITNESS: If a ladder is in good shape, it should not fail.

Q. And your counsel brought up a good point. Let me clarify that question. If a ladder is properly set up; in other words, extended with the side locked, it's in good shape, no other damage, a 375-pound person should be able to use that ladder without the ladder failing, correct?

A. I would agree.

Q. In fact, it may hold a 500-person [sic] on it if it's properly set up with no damage; is that correct?

A. Yes.

Q. And that's the redundancy that is built into the ladder to make it safer?

A. Yes.

Q. And you believe your ladders were made to sustain that, correct?

A. Correct."

¶ 23      **Plaintiff's Expert, John Newquist**

¶ 24      Plaintiff retained John Newquist as an expert witness. According to his report, Newquist is an independent safety consultant who worked for OSHA from 1983 through 2012.

¶ 25      Newquist's report indicated his view that ABSS had not complied with ANSI's "Standard for Ladder Portable Reinforced Plastic Safety Requirements," insofar as section 8.1.5 of that standard requires that " 'Design verification tests shall be conducted.' "

¶ 26      Newquist also stated that compliance with OSHA standards "would have prevented access to the unsafe ladder and the resulting fall." Specifically, Newquist cited the regulation which requires that a self-supporting portable ladder must be capable of supporting "At least four times the maximum intended load, except that each extra heavy-duty type 1A metal or plastic ladder shall sustain at least 3.3 times the maximum intended load." 29 CFR 1926.1053(a)(1).

¶ 27      Elsewhere in his report, Newquist stated that "The collapse of the ladder due to inadequate design and testing is one scenario that could explain the fall of Mr. Pike." Newquist opined:

> "Sunset/ABSS failed to act as a responsible manufacture of a ladder with the requisite testing records to verify that its ladders had the required design and strength to prevent collapse.
>
> Based on the standards of care for complying with ANSI standards, Sunset/ABSS should have the ladder documents documented for years. Sunset/ABSS was in deviation of these ANSI and OSHA Standards and this was a substantial factor in Mr. Pike's injuries on June 7, 2015.
>
> In summary, Sunset/ABSS failed to provide a workplace free of hazards and failed to comply with recognized industry and OSHA

standards for ladders. These deficiencies were a cause of Mr. Pike's accident and injuries."

¶ 28     **Newquist's Deposition Testimony**

¶ 29     At his deposition, Newquist testified that he is a "ladder safety expert" but not an expert in ladder design. Newquist did not have an opinion as to whether the fiberglass component of the subject ladder was defective. He also acknowledged that he had not identified a "design defect" in the ladder that related to the accident.

¶ 30     Asked if there was a "hazard in the ladder itself," Newquist answered that "one scenario is that there was a defect that was missed and another scenario is the ladder had no ability to support Mr. Pike's weight." That is, he differentiated between a "defect Mr. Brown missed" as opposed to "an internal problem, that you would not have caught." Newquist agreed that there was no evidence suggesting that the ladder had a visible defect, such as a crack, that Brown "missed" before Pike attempted to climb the ladder.

¶ 31      Newquist agreed it was possible that undetectable damage to the ladder could have "impair[ed] the load bearing integrity of the ladder" and contributed to the accident.  He agreed that since the ladder had been used for two years before the accident, it was "not in the same condition" as when it was originally sold, due to "wear and tear."

¶ 32     Newquist testified to his belief that Pike was not qualified to use the subject ladder, based on Pike's deposition testimony that he had not been trained in ladder safety. Newquist agreed that a ladder should not be used in excess of its duty rating, and that it is an unsafe practice to climb the ladder in excess of its duty rating. Newquist agreed that it would be an "overload" for a 350-pound person to use the subject ladder, and that one should not overload the ladder "[b]ecause that's what the manufacturer made it to handle." He testified that overloading the ladder can "possibly create

a collapse if the ladder is old" and that "as [ladders] get older, they get weaker." Newquist agreed with the statement that "Pike should not have used this ladder if he weighed 350-plus pounds because the ladder was rated only for 300 pounds."

¶ 33    Nonetheless, Newquist elsewhere testified that the ladder should have supported "3.3 or 4 times the rated load" and that "the OSHA standard means a ladder has to be supporting four times the maximum intended load." Asked if the ladder would collapse if Pike weighed 301 pounds (one pound more than its stated capacity), Newquist answered: "If the ladder was properly designed, there are safety factors. One pound would not make a difference." However, Newquist was equivocal as to whether the ladder should have supported 350 pounds:

> "Q. Do you know if the safety factors should have prevented the ladder
>
> from collapsing even at 350 pounds while just ascending it?
>
> A. If everything was done correctly with the manufacturer, it should not
>
>    have collapsed.
>
> Q. Even at 350, correct?
>
> A. We don't know because there's no testing at 350 by these companies.
>
> Q. Okay. So you don't know one way or the other if it would have
>
>    collapsed at 350 if the ladder was perfect, correct?
>
> A. That's correct."

¶ 34    **Motion for Summary Judgment**

¶ 35    On February 1, 2021, ABSS and Sunset jointly filed a motion for summary judgment, arguing there was no evidence that a defect in the ladder existed when it left their control.[4] They argued that Pike needed expert testimony to establish a specific defect, but his expert, Newquist, had

---

[4] ABSS and Sunset are represented by the same counsel.

"identified neither a design defect nor a manufacturing defect" and offered no opinion about the ladder's warnings.

¶ 36 Elsewhere in the motion, ABSS and Sunset acknowledged that even without expert testimony identifying a specific defect, a plaintiff may prevail in strict liability if he proves (1) there was no abnormal use of the product, (2) that there was no reasonable secondary cause of the injury, and (3) that the product failed to perform in the manner reasonably expected in light of its intended function. However, they urged that Pike could not "rule out abnormal use or reasonable secondary causes of plaintiff's fall." They pointed out that the ladder was over two years old at the time of the incident, and that Newquist acknowledged that the ladder might have had undetected damage.

¶ 37 They also noted that Pike "weighed more than the ladder's duty rating" and there was no evidence to "rule out how plaintiff's weight might have caused or contributed to the accident." ABSS and Sunset urged that Pike could not succeed on a "non-specific defect theory" because there was "evidence of abnormal use (plaintiff weighing more than the duty rating) and reasonable secondary causes (prior undetected damage, plaintiff losing his balance)." Thus, ABSS and Sunset argued that summary judgment in their favor was warranted.

¶ 38 In response to the motion, Pike argued that summary judgment was improper because a "jury should decide whether or not a 2-year old ladder designed and manufactured to hold over 900 lbs. was unreasonably dangerous" when it "collapsed under the Plaintiff, who only weighed 350 [pounds]." Pike argued that, despite the 300-pound load capacity, Becnel "admitted that the ladder needs to be designed and manufactured to hold over 900lbs" under ANSI standards. Pike recited Becnel's testimony agreeing that ABSS ladders are designed to support 900 to 1200 pounds and should not fail even under a 375-pound or 500-pound person. Pike claimed ABSS did not show

that it "complied with ANSI standards", pointing out that the only testing documents produced were from 2004 (before the ladder's manufacture) and 2017, two years after Pike's injury.

¶ 39    Pike did not dispute that Newquist had not identified a specific defect. However, Pike cited authority that expert opinions and proof of a specific defect is not necessary in a strict liability case, if circumstantial evidence demonstrates the product did not perform in manner reasonably to be expected by the consumer.   Pike cited case law for the proposition that there is *prima facie* case of strict liability where a ladder collapses without any sign of prior damage, where there is no evidence of abnormal use or reasonable secondary causes. Pike argued there was undisputed testimony that the ladder had no prior signs of damage, that it was on a stable surface with its cross-braces locked, and that Pike ascended the ladder properly.

¶ 40    Pike also challenged the suggestion that, because he weighed more than the 300-pound load capacity, his use of the ladder was abnormal or that he "misused" it. Pike argued that "misuse" occurs when a product is used for a purpose "neither intended nor reasonably foreseeable" by a defendant, but that his use of the ladder was an "intended and reasonably foreseeable use."  Pike also argued that there was no evidence to support any "speculative secondary causes" for the incident besides a product defect. Pike argued that he "need not exclude every possible cause" but was only required to show a "greater likelihood that his injury was caused by the defendant's negligence than by some other cause."

¶ 41    In their reply, ABSS and Sunset disputed that the record evidence permitted an inference of a defect. They urged that such an inference was inappropriate because "(1) the subject ladder was not new (2) it was regularly used on [a] commercial jobsite; (3) there is evidence of abnormal use (Plaintiff's weight exceeded the ladder's duty rating); and (4) Plaintiff's own expert cannot rule out secondary causes of the accident." ABSS and Sunset pointed out that the ladder was two years

old at the time of the accident. They also noted that their retained expert, Erick Knox, observed scrapes, gouges, abrasions and marks that were consistent with "normal use over roughly 2.5 years."

¶ 42   ABSS and Sunset argued that there was "abnormal use" precluding an inference of defect, because Pike "weighed in excess of the ladder's duty rating." ABSS and Sunset also asserted that Pike had not ruled out "reasonable secondary causes." They noted that Newquist admitted the possibility that the ladder contained undetectable damage before Pike used it. ABSS and Sunet averred that Pike could not rule out "the reasonable explanation that Charlie Brown was able to climb up the subject ladder with undetectable damage, but Plaintiff, who weighed 125 pounds more, was not." ABSS and Sunset urged this "prevent[ed] an inference of a defect," such that Pike could not establish a *prima facie* case of strict liability.

¶ 43   As an exhibit to their reply brief, ABSS and Sunset attached an affidavit from Knox, in which he stated that his inspection of the ladder showed "miscellaneous non-structural scrapes, gouges, and transfer on the ladder at various locations." Knox opined that the "majority of these conditions were present prior to the June 7, 2015 accident" but "did not affect the structural integrity or stability of the ladder." Knox stated that the ladder "exhibited signs of wear consistent with a ladder that was regularly used over approximately 2.5 years in a commercial capacity."

¶ 44   **Summary Judgment Ruling**

¶ 45   The record reflects that the court conducted a hearing on ABSS and Sunset's summary judgment motion on May 13, 2021. However, the record on appeal does not contain a transcript of that hearing.[5]

_____

[5] This court's records reflect that on June 25, 2021, Pike submitted to our court a request for preparation of the transcript from the May 13, 2021 hearing. However, no report of proceedings has been filed in this court. The record on appeal consists only of the common law record.

¶ 46   On May 13, 2021, the trial court entered a single-page order granting summary judgment to ABSS and Sunset with respect to Pike's claim for strict liability. That order did not state the trial court's reasoning. The court specified that there was "no just cause to delay enforcement or appeal" of the order, permitting us to exercise appellate jurisdiction pursuant to Supreme Court Rule 304(a).[6]

¶ 47   **Post-Appeal Orders**

¶ 48   On June 11, 2021, Pike filed his notice of appeal from the order granting ABSS and Sunset's motion for summary judgment. On September 30, 2021, this court dismissed the appeal for want of prosecution because Pike had not filed a record on appeal. Our supreme court subsequently entered a supervisory order directing us to vacate the September 30, 2021 order and allow Pike further time to file the record on appeal. Accordingly, on December 2, 2021, we reinstated the appeal. The record on appeal was filed in this court on January 6, 2022.

¶ 49                    ANALYSIS

¶ 50   On appeal, Pike argues that the court erred in granting summary judgment in favor of ABSS and Sunset, as he asserts there was evidence creating a genuine issue of material fact as to his claim for strict liability pursuant to *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 574 (1976). Importantly, Pike does not attempt to argue that he produced expert testimony describing any *specific* defect in the ladder at issue. Instead, he asserts that even without expert testimony about a specific defect, the circumstantial evidence is sufficient to support an inference of a defect in the ladder when it left the control of ABSS and Sunset. ABSS and Sunset respond that summary

---

[6] Also on May 13, 2021, the court entered separate orders (1) denying Freeman and Freeman Electrical's motion for summary judgment with respect to Pike's claims against them and (2) denying Absolute's motion to dismiss the counts asserted against it in Freeman's third-party complaint. Those orders are not at issue in the instant appeal.

judgment was properly entered in their favor, where (1) there is no expert testimony regarding a specific defect and (2) the circumstantial evidence does not support an inference of defect under *Tweedy* and related precedent. In particular, they argue that the *Tweedy* approach applies only in the absence of abnormal use of the product, and if other reasonable causes can be ruled out. Given the fact that Pike weighed more than the load capacity and other evidence, ABSS and Sunset contend that Pike cannot meet these requirements to support an inference of defect and survive summary judgment.

¶ 51 For the following reasons, we agree with ABSS and Sunset and affirm the trial court's entry of summary judgment.

¶ 52 Standard of Review

¶ 53 "Summary judgment is appropriate only where 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 25 (quoting 735 ILCS 5/2-1005(c) (West 2012)). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. "Because summary judgment is a drastic means of disposing of litigation, a court must exercise extraordinary diligence in reviewing the record so as not to preempt a party's right to fully present the factual basis for its claim." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005).

¶ 54 Although a plaintiff is not required to prove his case, summary judgment is appropriate if a plaintiff cannot establish an element of his claim. *Id.*; see also *Lewis v. Lead Industries Ass'n*, 2020 IL

124107, ¶ 15. ("If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is appropriate. [Citations.]").

¶ 55 "A defendant moving for summary judgment may meet its initial burden of proof by affirmatively showing that some element of the case must be resolved in his favor or by establishing that there is an absence of evidence to support the nonmoving party's case. [Citation.]" *Freedberg v. Ohio Nat. Ins. Co.*, 2012 IL App (1st) 110938, ¶ 25. Summary judgment "should only be granted when the right of the moving party is clear and free from doubt." *Lewis*, 2020 IL 124107, ¶ 15.

¶ 56 The applicable the standard of review is *de novo. Id*. We may affirm a grant of summary judgment on any basis appearing in the record. *Northern Illinois Emergency Physicians,* 216 Ill. 2d at 306.

¶ 57 Elements of a Strict Liability Claim

¶ 58 Here, Pike's sole theory of liability against both ABSS and Sunset is strict liability for a defective product. We review the elements of that claim.

¶ 59 "Under common law, all entities in the distributive chain of an allegedly defective product *** are strictly liable in product liability action for injuries result from that product." *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 381 Ill. App. 3d 768, 773 (2008). "This liability is predicated on a finding that the product is unreasonably dangerous, regardless of fault. [Citation.]" *Id.* A strict liability claim " 'focuses on the product rather than the conduct of the manufacturer.' " *Blue v. Environmental Engineering, Inc.,* 215 Ill. 2d 78, 94 (2005) (quoting Restatement (Third) of Torts: Products Liability § 1, Comment a, at 7 (1998))."

¶ 60 "To recover in a product liability action, a plaintiff must plead and prove that the injury resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time the product left the manufacturer's control. [Citations.]" *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002). "A product may be found unreasonably dangerous by virtue of a

physical flaw, a design defect, or a failure of the manufacturer to warn of the danger or instruct on the proper use of the product as to which the average consumer would not be aware. [Citation.]" *Id.*

¶ 61 A manufacturing defect claim is distinct from claim of defective design or inadequate warning. "A manufacturing defect differs from a design defect in that the former occurs in only a small percentage of units in a product line, where the latter arises when the specific unit conforms to the intended design but the intended design itself or its sale without adequate instructions or warnings renders the product not reasonably safe." *Blue*, 215 Ill. 2d 78, 89-90 (citing Restatement (Third) of Torts: Product Liability § 1, Comment a, at 6 (1998.)) "A manufacturer is liable for [manufacturing] defects no matter how adequate and careful its quality control may have been. However, a *design* defect suit is more akin to a negligence claim." *Id.* at 95.

¶ 62 Claims of manufacturing defect are subject to the "consumer-expectation test" derived from section 402A of the Restatement (Second) of Torts. *Blue*, 215 Ill. 2d at 90. Under that inquiry, "A product is unreasonably dangerous when it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (Internal quotation marks omitted.) *Id.* at 91.

¶ 63 Notably, although Pike's complaint alleged that the ladder was defective in "one or more" respects, including failure to "meet industry design standards" or "fail[ure] to contain adequate warnings regarding weight limitations," his briefing in the trial court and in this court relies solely on a manufacturing defect theory. Pike does not suggest that there was any evidence of a flaw in the ladder's design—to the contrary, he suggests that the ladder was designed to be able to support at least 900 pounds. Nor does he suggest there was any deficiency in the ladder's labeling or

warnings.[7] Rather, he claims that there is evidence raising a factual issue as to whether there was a flaw in the ladder's manufacture when it left ABSS's control that caused his injury.

¶ 64    Requisite Proof to Support an Inference of Defect

¶ 65    Pike does not dispute that his expert, Newquist, did not specify a particular defect that caused the ladder to collapse. However, he argues that he met the quantum of proof necessary to sustain a strict liability action pursuant to our supreme court's decision in *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 574 (1976), and related precedent.

¶ 66    *Tweedy* established that circumstantial evidence sometime may support an inference of defect supporting strict liability. In, *Tweedy* defendant Ford Motor Company appealed following a jury verdict in plaintiff's favor. At trial, the evidence showed that the brakes on a Ford vehicle failed when it had been driven approximately 7,500 miles, following an inspection at 6000 miles. Plaintiff did not offer any expert testimony regarding any specific defect in the automobile brake system. *Id* at. 572. Before our supreme court, Ford argued that plaintiff failed to prove that the vehicle was defective when it left Ford's control, and that "evidence of the malfunction when plaintiff was injured did not prove a defect." *Id.* at 573.

¶ 67    Our supreme court disagreed, holding that "[a] *prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed to perform in the manner reasonably to be expected in light of [its] nature and intended function." (Internal quotation marks

---

[7] Given his admission that he never read the warnings, Pike could not successfully claim that his injury was proximately caused by an inadequate warning. See *Kane v. R.D. Werner Co.*, 275 Ill. App. 3d 1035 (1995) (plaintiff who did not read allegedly inadequate warning cannot maintain a product liability action based on negligent failure to warn, unless nature of inadequacy is that it prevented him from reading the warnings).

omitted.) *Id*. at 574. The *Tweedy* court noted that the evidence showed that the automobile had been inspected and "subjected to no abnormal use" before the incident, but it "failed to function in the manner reasonably to be expected." *Id*. Further, the "[p]laintiff was driving carefully at a reasonable rate of speed *** and there was no evidence of any reasonable secondary cause." *Id.* at 574-75.

¶ 68    Following *Tweedy*, "courts in this State have generally held that a plaintiff need not pinpoint the specific defect in a product in order to recover under strict liability." *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 377 (1993). "Instead, a plaintiff may create an inference that a product was defective by direct or circumstantial evidence that (1) there was no abnormal use of the product; (2) there was no reasonable secondary cause of the injury; and (3) that the product failed to perform in the manner reasonably to be expected in light of its nature and intended function. [Citations.]" *Id.*

¶ 69    *Doyle*, which also concerned a ladder, illustrates the distinction between a claim alleging a specific defect and a claim relying on an inference of defect. The *Doyle* plaintiff brought a two-count product liability action, in which count I alleged the ladder was " 'unreasonably dangerous for users because [it] failed to perform in a manner reasonably expected since it was incapable of sustaining human weight when used in a foreseeable manner without collapsing.' " *Id.* at 372. Our court in *Doyle* referred to this as the "*Tweedy* count." *Id*. at 377, 379. The second count alleged a specific defect, namely, that the ladder's rear rails were too weak and its steps were too narrow. *Id.* at 372. On appeal from a jury verdict for plaintiff, our court held that the jury instructions regarding count I "misstated the law" where they "allowed the jury to find that the ladder was unreasonably dangerous if it found only that the ladder failed to perform in the manner reasonably to be expected in light of its intended function." *Id*. at 379. Our court in *Doyle* explained that since

"no specific defect in the product was alleged, plaintiff was required to prove that he did not use the product in an unreasonable manner and that no reasonable secondary causes of his injury existed." *Id.* Nevertheless, our court found that this error with respect to count I did not merit reversal, because the jury was not asked to specify whether it based its verdict on count I or count II. *Id.* at 379-80.

¶ 70    In this appeal, Pike acknowledges that Newquist did not identify to a specific defect in the ladder that caused the collapse. Regardless, he contends that, pursuant to *Tweedy*, there was sufficient direct or circumstantial evidence to create an inference that the ladder was defective. He claims there is a *prima facie* case of strict liability because the ladder had "no sign of damage" and there is "no evidence of 'abnormal use or reasonable secondary causes.'"

¶ 71     Pike suggests the circumstantial evidence was akin to that in other ladder cases where there was sufficient evidence to support strict liability. Pike relies largely on *Gillespie v. R.D. Werner Co.,* 71 Ill. 2d 318 (1978), where our supreme court affirmed a plaintiff's jury verdict, over the manufacturer's contention that it was entitled to judgment notwithstanding the verdict. Our supreme court found sufficient evidence to establish a *prima facie* case of strict liability, where "the evidence d[id] not show 'abnormal use or reasonable secondary causes" for the ladder's collapse. *Id.* at 320-21. Our supreme court emphasized the testimony that the plaintiff, Gillespie, used the ladder properly:

> "Gillespie and his aide, finding the ladder to be 'new' and nothing
> wrong with it, used it while doing electrical work above a drop
> ceiling. The helper handed tools to Gillespie * * *. Gillespie denied
> he worked to the side in such a way as to cause an imbalance. The
> concrete floor was level and covered with tiles. The owner and

operator of the company renting the ladder to Gillespie's employer testified that it was his practice 'to check and insect all equipment' he rented out. Given this evidence, it was reasonable for the jury to conclude there was an absence of abnormal use and that the ladder failed 'to perform in the manner reasonably to be expected in light of' its 'intended function.' " *Id*. at 321-22.

¶ 72 Our supreme court in *Gillespie* expressly distinguished a Massachusetts supreme court decision that entered judgment for a ladder manufacturer, where there was "no evidence that the plaintiff put the ladder to the normal use for which it was intended.'" *Id*. at 322 (citing *Coyne v. John S. Tilley Co.,* 368 Mass. 230, 331 N.E. 2d 541 (1975)). In contrast to that case, our supreme court in *Gillespi*e found "there was sufficient evidence for the jury to infer that Gillespie could be eliminated as a cause of his injuries," reiterating the testimony that he properly used the ladder. *Id*. at 322-23. That is, " 'a trier of fact could infer as [a] matter of common knowledge that a relatively new *** properly fabricated and designed aluminum ladder which had received proper care and usage would not collapse if put to the use for which it was intended.'" *Id.* at 323 (quoting *Coyne*, 331 N.E. 2d at 545).

¶ 73 Pike also directs our attention to *Tulgetske v. R.D. Werner*, 86 Ill. App. 3d 1033 (1980), which rejected a ladder manufacturer's contention that it was entitled to a directed verdict, due to lack of evidence of defect. In *Tulgetske*, this court reiterated that a *prima facie* case can be made by proof that in the absence of abnormal use or reasonable secondary causes, the product failed to perform in the manner reasonably to be expected. *Id.* at 1038. We concluded that there was proof from which the jury could find a defect, even without expert testimony, where "there was evidence that the plaintiff inspected the ladder, and it appeared to be in good condition; that he placed the ladder

firmly on solid ground in a stable position; that his use of the ladder was normal and foreseeable; that he felt the ladder give way and 'crunch' beneath him." *Id.* In light of plaintiff's testimony and corroborating witnesses, we found it was "reasonable for the jury to conclude that there was no abnormal use and that the ladder failed to perform in the manner reasonably to be expected in the light of its intended function." *Id*.

¶ 74    Pike suggests that the evidence here is similar to that in *Gillespie* and *Tulgetske*. He claims that the ladder in this case was "relatively new" and in "good condition" with "no defects noted upon inspection." He suggests the evidence shows the ladder "was being used in a normal and foreseeable way" before the incident, such that a defect can be inferred. In urging that there is no evidence of "abnormal use," he cites his undisputed testimony that the ladder was on a flat surface, its cross braces were locked, and that he climbed it "with his body centered between the two rails of the ladder with his right hand on the right rail and his left hand on the left rail."

¶ 75    In response, ABSS and Sunset contend that Pike cannot establish a *prima facie* case of strict liability based on an inference of defect for two reasons. First, they claim that Pike failed to show the absence of "abnormal use." Second, they assert that Pike failed to offer evidence to eliminate "reasonable secondary causes" of the incident. We address those in turn.

¶ 76    <u>Evidence of Pike's "Abnormal Use"</u>

¶ 77    First, we agree that Pike cannot show the absence of "abnormal use," as that term is used in *Tweedy* and its progeny, as it is undisputed that Pike weighed approximately 350 pounds, exceeding the ladder's stated load capacity of 300 pounds. We note that there is no dispute that the ladder's load capacity was clearly labeled. Pike has never contended that the labeling was inadequate or that he could not see it. Instead, he acknowledged that he did not check the label, indicating he assumed the ladder would support him. There is no question that Pike overloaded the ladder. Tellingly,

Pike's own expert acknowledged that ladders should not be loaded beyond their capacity rating. We believe this establishes an absence of abnormal use.

¶ 78 Pike disputes the proposition that his use of the ladder beyond its stated 300-pound capacity equates to abnormal use or "misuse." He directs our attention to *Arellano v. SGL Abrasives*, 246 Ill. App. 3d 1002 (1993). However, we find that decision is inapplicable.

¶ 79 In *Arellano*, plaintiff suffered injuries while working in a foundry, when the grinding wheel he was using broke and exploded after 10 or 15 minutes of use. The defendant manufacturer denied any defect and claimed plaintiff misused the wheel. *Id.* at 1003. At trial, defendant offered expert testimony that plaintiff could have avoided injury by using a guard on the grinding wheel. *Id*. at 1005.The defense expert opined that the wheel at issue broke due to either product misuse, or damage after its manufacture. *Id.*

¶ 80 The jury returned a general verdict for plaintiff but found that due to plaintiff's product misuse, damages should be reduced by 70%. *Id.* at 1003. After post-trial motions, the trial court granted defendant judgment notwithstanding the verdict (j.n.o.v.) and vacated the jury's misuse finding. *Id*. Plaintiff appealed the grant of j.n.ov., and defendant cross-appealed the vacation of the misuse finding. *Id.*

¶ 81 Our court first found that j.n.o.v for defendant was improper, as there was sufficient evidence from which the jury could infer a manufacturing defect in the broken wheel. *Id*. at 1006-07 (noting the jury could credit plaintiff's testimony that he "assured that [the wheel] was properly mounted" before use.) That is, the jury could credit his testimony that he was injured by "a new grinding wheel after normally mounting it and using it normally for a short period of time." *Id*. at 1009.

¶ 82    This court then addressed the cross-appeal, in which defendant sought reinstatement of the jury's finding of misuse because "plaintiff's use of the grinding wheel without a guard constituted misuse." *Id*. *Arellano* explained the concept of misuse as follows:

> "[P]roduct misuse is an affirmative defense which operates to reduce a plaintiff's recovery by the amount of fault apportioned to him. Misuse of a product occurs when it is used for a purpose neither intended nor reasonably foreseeable by the defendant based on an objective standard. The manner in which the particular purpose was being accomplished is not an issue under a theory of misuse. [Citation.]" *Id.* at 1010.

¶ 83    *Arellano* proceeded to reject defendant's misuse argument, explaining:

> "Plaintiff was clearly doing an act of grinding when injured. Grinding is an intended and reasonably foreseeable use of a grinding wheel. The absence of the guard goes to the manner in which the grinding wheel was being used. If anything, plaintiff was contributory negligent in using the grinder without a guard. Contributory negligence, however, is not a defense to strict liability. [Citation.]" *Id*.

¶ 84    Here, Pike argues that, just as grinding the wheel in *Arellano* was an intended and reasonably foreseeable use, in this case he did not "misuse" the ladder because "climbing the ladder was also the obvious intended and reasonably foreseeable use of the ladder." He also avers that, because "redundancy is required to be built into every ladder per ANSI and OSHA standards, clearly there is an expectancy that a ladder must be able to be used over its intended load capacity." Thus, he

claims there was an absence of "abnormal use," which permits an inference of defect pursuant to *Tweedy.*

¶ 85    We find Pike's reliance on *Arellano* is unavailing for multiple reasons. First, the case law does not indicate that the defense of "misuse" discussed in *Arellano* is equivalent to the concept of "abnormal use", in the context of an inference of defect where a product malfunctions "in the absence of abnormal use or reasonable secondary causes." *Gillespie*, 71 Ill. 2d at 321 (quoting *Tweedy*, 64 Ill. 2d at 574).   "[M]isuse is an affirmative defense" to reduce a plaintiff's recovery. *Arellano*, 246 Ill. App. 3d at 1010; see also *Williams v. Brown Mfg. Co*, 45 Ill. 2d 418, 425-26 (1970) ("[I]t has generally been recognized in Illinois and elsewhere that plaintiffs who 'misuse' a product—uses it for a purpose neither intended nor 'foreseeable' (objectively reasonable) by the defendant—may be barred from recovery. [Citations.]" In contrast**,** evidence showing a lack of "abnormal use" is a prerequisite to support an inference of defect in a strict liability case. *Tweedy*, 64 Ill. 2d at 574; *Doyle,* 249 Ill. App. 3d at 377.

¶ 86    Moreover, even if we were to conclude that the definition of "misuse" applies equally to the concept of "abnormal use", it would still be unavailing to Pike under the facts of this case. Misuse occurs when a product "is used for a purpose *neither intended nor reasonably foreseeable* by the defendant based on an objective standard." (Emphasis added.) *Arellano*, 246 Ill. App. 3d at 1010.

¶ 87    In our view, the evidence is clear and undisputed that the manufacturer did not "intend" for the ladder at issue to be climbed by someone weighing over 300 pounds. To the contrary, the evidence makes clear that such use was unintended and abnormal. There is no dispute that the ladder's duty rating was 300 pounds, which was explicitly stated on the label. Although Becnel acknowledged that ABSS ladders were designed to be capable of supporting a much heavier person, he testified that the stated capacity is "the capacity that you're not supposed to exceed." Significantly,

plaintiff's own expert, Newquist, agreed that it would be an "overload" for a 350-pound person to use the ladder, and that one should not overload the ladder "[b]ecause that's what the manufacturer made it to handle." Newquist agreed with the statement that "Pike should not have used this ladder if he weighed 350-plus pounds because the ladder was rated only for 300 pounds."

¶ 88 Indeed, Pike's opening brief essentially acknowledges that persons weighing more than 300 pounds were not "intended" users, insofar as he claims there is an "expectation that a ladder must be able to be used *over its intended load capacity.*" (Emphasis added). On this point, we recognize there was evidence that ABSS ladders were designed to be *capable* of holding more weight than the stated load capacity, consistent with ANSI and OSHA standards. Despite evidence that ABSS ladders were designed with this redundancy, that does not mean ABSS *intended* for persons weighing more than 300 pounds to climb on ladders with a duty rating indicating a 300-pound capacity. While evidence of this redundancy could be relevant to whether use by a heavier person was *foreseeable* to the manufacturer, that is a distinct matter from whether such use was *intended*. See *Arellano*, 246 Ill. App. 3d at 1010 (misuse use occurs where a product "is used for a purpose "neither intended nor reasonably foreseeable by the defendant").

¶ 89 For the same reasons, we agree with ABSS and Sunset that Pike cannot establish a lack of "abnormal use of the product," which is necessary to support an inference of defect. *Doyle*, 249 Ill. App. 3d at 377**.** Rather, we think it is apparent that where a 350-pound person climbs on a ladder that has a rated capacity of 300 pounds, this constitutes "abnormal use" of the product. This plainly distinguishes this case from the other ladder cases cited by Pike, where there was evidence that the ladders were properly used and not overloaded. See *Gillespie*, 71 Ill. 2d at 323 (based on testimony describing plaintiff's use of ladder, "an inference could be made that the ladder was not overloaded"); *Tulgetske*, 86 Ill. App. 3d at 1038, (plaintiff made a *prima facie* case where there

was evidence that plaintiff's "use of the ladder was normal and foreseeable"). In contrast, here there is uncontroverted evidence that Pike overloaded the ladder by approximately 50 pounds. Pike's abnormal use precludes him from creating an inference of defect, such that ABSS and Sunset were entitled to summary judgment.

¶ 90 To be clear, our conclusion does not indicate that an injured person whose weight exceeded the intended capacity can *never* establish liability for a defect. However, in this appeal, Pike does not identify any evidence of a specific manufacturing defect, or any design defect or inadequate warning.[8] The sole theory of strict liability pursued by Pike requires proof to support an inference of defect, including evidence that there was not "abnormal" use. See *Doyle*, 249 Ill. App. 3d at 377 (a plaintiff may create an inference of defect through evidence that "there was no abnormal use of the product", there was "no reasonable secondary cause of the injury" and the product failed to perform in the manner reasonably to be expected). Our conclusion that Pike cannot establish the absence of "abnormal use" is independently dispositive in favor of ABSS and Sunset.

¶ 91 The Evidence Does Not Rule Out Reasonable Secondary Causes

¶ 92 Although we could affirm solely due to Pike's abnormal use, we also note that summary judgment is otherwise warranted because Pike cannot show that there was "no reasonable secondary cause of the injury," which is otherwise required to create an inference of a manufacturing defect pursuant to *Tweedy* and its progeny. *Id.*; see also *Gillespie*, 71 Ill. 2d at 321 (a *prima facie* case of defect "is made by proof that in the absence of abnormal use or reasonable secondary causes" the product failed to perform in the manner reasonably to be expected).

---

[8] To the extent Pike references the lack of testing documents produced by ABSS and Newquist's corresponding opinion that testing was inadequate, that does not suggest any specific defect in the manufacture of the ladder at issue. Moreover, insofar as Pike is only pursuing a strict liability manufacturing defect claim (not a negligence claim), evidence of a defendant's conduct is irrelevant. See *Blue*, 215 Ill. 2d at 95.

¶ 93 Based on the undisputed evidence, we agree with ABSS and Sunset that reasonable secondary causes cannot be ruled out. First, as discussed, there is undisputed evidence that Pike overloaded the ladder approximately 50 pounds beyond its 300-pound duty rating. Regardless of whether this is considered "abnormal use," the admitted overloading of the ladder otherwise constitutes a reasonable secondary cause of the collapse that cannot be ruled out. This is especially the case, since it was undisputed that the ladder was over two years old at the time of Pike's injury in June 2015, having been manufactured by ABSS in 2013. The record indicates that after it was delivered to Freeman in 2013, the ladder could have been used numerous times at various job sites before the date of Pike's injury. Pike's expert acknowledged that "as [ladders] get older, they get weaker" and that the subject ladder would not be in its original condition due to "wear and tear." Elsewhere, he testified that overloading the ladder can "possibly create a collapse if the ladder is old." It is certainly a reasonable possibility that during its two-year period of use following manufacture, the ladder sustained damage and was weakened such that it could not support a 350-pound person. Indeed, Pike's expert witness acknowledged that undetected damage to the ladder could have "impair[ed] the load bearing integrity of the ladder" and contributed to the accident.

¶ 94 Given this evidence, Pike cannot show "that there was no reasonable secondary cause of the injury", an independent requirement to support an inference of defect. *Doyle*, 249 Ill. App. 3d at 377. This independently warranted summary judgment in favor of ABSS and Sunset on Pike's strict liability claim.

¶ 95                                                     CONCLUSION

¶ 96 In summary, the undisputed evidence is such that Pike cannot show the absence of abnormal use of the ladder immediately before his injury. Moreover, the evidence shows that he cannot rule out reasonable secondary causes of his injury. In turn, the evidence does not support an inference of a

product defect necessary to support Pike's strict liability claim against ABSS and Sunset. Accordingly, the summary judgment motion was properly granted in favor of ABSS and Sunset.

¶ 97    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 98    Affirmed.